**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7263**

WRITER'S EMAIL ADDRESS
**christopherkercher@quinnemanuel.com**

May 24, 2019

**VIA ECF**

Hon. John Michael Vazquez
United States District Court
District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07102

Re:   *In re Application of Comodo Holdings Limited (Untracht)*, No. 2:18-CV-13755-JMV,
      **Supplemental Letter Brief Regarding Constructive Possession**

Dear Judge Vazquez:

    We represent Proposed Intervenor Joseph Katz, as Executor of the Estate of Eric D. Emanuel, (the "Estate"), in the above-captioned matter, and write in connection with the Estate's pending Motion to Reopen and to Intervene (ECF No. 3). Specifically, we write in response to the Court's question raised during the May 20, 2019 telephonic conference, and in accordance with ECF No. 18's Text Order, regarding whether the Estate has "constructive possession over Mr. Emanuel's tax documents held by Mr. David Untracht." (ECF No. 18.) In short, while New Jersey law suggests that the Estate likely has constructive possession over Mr. Emanuel's tax returns themselves (although constructive possession is less clear for other documents that may be found in Mr. Untracht's records), the BVI Court's orders and statements regarding appropriate disclosure should be conclusive in the instant discovery dispute.[1]

    The plain meaning of "constructive possession" is "[c]ontrol or dominion over a property without actual possession or custody of it." *Constructive Possession*, Black's Law Dictionary (10th ed. 2014). Although the Estate has not located binding authority in this Circuit, courts in other jurisdictions deem a party to have constructive possession over documents if the party has a

---

[1]   Because there is no equivalent in BVI civil litigation, the concept of "constructive possession" has not been raised there.

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE | BOSTON | SALT LAKE CITY
LONDON | TOKYO | MANNHEIM | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH | SHANGHAI | PERTH | STUTTGART

legal right to obtain them from a third party.  *See, e.g., Bank of N.Y. v. Meridien BIAO Bank Tanz. Ltd.*, 171 F.R.D. 135, 154 (S.D.N.Y. 1997); *Schoenholz v. Hinzman*, 2014 WL 4627584, at *2 (Kan. Ct. App. 2014); *Paiewonsky v. Paiewonsky*, 50 F.R.D. 379, 381-82 (D.V.I. 1970).  Because the executor of an estate assumes the legal rights of the testator, whether the Estate has constructive possession of documents in Mr. Untracht's files turns on whether Mr. Emanuel would have had the right to demand access to these documents prior to his death in October 2006.  *Cf. Estate of Schneider v. Finmann*, 15 N.Y.3d 306, 309 (2010) (estate "stands in the shoes of a decedent").

In New Jersey, accountants are required to provide copies of certain documents demanded by clients or former clients.  *See* N.J. Admin. Code § 13:29-3.16(a).[2]  Specifically, clients have a legal right to, and accountants must provide upon demand:  (1) copies of tax returns, (2) copies of reports issued to/for a client, (3) accounting records belonging to (i.e. furnished by) or obtained on behalf of the client, and (4) copies of information contained in working papers that "would ordinarily constitute part of the client's books and records, and are not otherwise available to the client."  N.J. Admin. Code § 13:29-3.16(a).  New Jersey's statute does not specifically define what documents this provision encompasses.  *Id.*  The Code of Professional Conduct of the American Institute of Certified Public Accountants ("AICPA Rules"), which is incorporated by reference in the New Jersey law, *see id.* § 13:29-3.19, provides that this encompasses documents the omission of which would "render[] the client's financial information incomplete.  Examples include adjusting, closing, combining, or consolidating journal entries (including computations supporting such entries) and supporting schedules and documents that the member proposed or prepared as part of an engagement (for example, an audit)."[3]  Whether the other documents Comodo seeks here—in requests that are overly broad and unwieldly—fall within the delineated categories is unclear.  Thus it is unclear to what extent the Estate has constructive possession over documents other than Mr. Emanuel's tax returns, to the extent they exist.[4]

---

[2]  The laws governing accountants' obligations in New York are substantially similar to those in New Jersey.  *Compare id.*, *with* 8 N.Y.C.R.R. 29.10(a)(8).

[3]  AICPA, *Aicpa Code of Professional Conduct* Rule 1.400.200.01(a) (2014), https://www.aicpa.org/content/dam/aicpa/research/standards/codeofconduct/downloadabledocum ents/2014december15contentasof2016august31codeofconduct.pdf.

[4]  Even if the Estate did at one point have constructive possession over documents in Mr. Untracht's control other than Mr. Emanuel's tax returns, it may be that the Estate would not retain constructive possession over them today.  For example, where a client who had constructive possession of documents at one point, but impliedly abandoned them by allowing the accountant to retain actual possession with no inquiries from the client for a lengthy period of time, courts have held that the client ceases to be in "constructive possession" of those documents.  *See, e.g., Couch v. United States*, 409 U.S. 322, 333-34 (1973).

This conclusion is bolstered by the rules of the New Jersey State Board of Accountancy and the as-incorporated AICPA Rules.  Under these rules, accountants are under no ethical duty to retain records for longer than required by professional standards or state or federal law.  *See* AICPA, *supra note* 3, Rule 1.400.200.05(b).  AICPA has suggested that seven years is the appropriate amount of time to retain clients' records.  *See* AICPA Tax Practice Improvement Comm. Working

This is exactly what the BVI Court ordered.  On July 7, 2017, Comodo issued a discovery application seeking various categories of documents from Mr. Untracht dated between 1998 and 2006.  (ECF No. 3-3 ("Peaty Aff.") ¶ 9.)[5]  In an order dated December 11, 2017, the BVI Court directed the Estate to disclose "Tax returns of Mr. Emanuel for the years 1998 to 2002, *insofar as they are located and produced by Mr. Untracht*."  *Id.*  In so doing, the BVI Court rejected Comodo's other requests for documents from Mr. Untracht.  *Id.*  In accordance with that order, BVI counsel for the Estate contacted Mr. Untracht.  In an email dated December 20, 2017, Mr. Untracht informed the Estate's BVI counsel that he "had a box retrieved from [the] archive and will look through it in the morning."  (ECF No. 1-7.)[6]  The Estate's BVI counsel continued to follow up with Mr. Untracht, but on January 5, 2018, he informed them that he had not yet made a detailed search of the box to find Mr. Emanuel's tax returns from 1998-2002.  (Peaty Aff. ¶ 9.)

On January 29, 2018, Comodo served a second discovery application, which sought— notwithstanding the BVI Court's prior limiting order—(1) an order directing the Estate's BVI counsel to send to Comodo's BVI counsel "written authorities . . . to request Mr Emanuel's Tax Returns and tax filings from the New York State and to the Internal Revenue Service, (2) with respect to "the box of documents retrieved by Mr Untracht" referenced in the December 20, 2017 email, an order directing the Estate to (a) "file and serve a further affidavit explaining the contents of that box," and (b) "give disclosure of any relevant documents contained in that box (including, but not limited to, any Tax Returns and tax filings of Mr Emanuel for the years 1998 to 2006)."  (ECF No. 1-8.)[7]  At a hearing on February 22, 2018, as reflected in the transcript, the BVI Court stated that the Estate must provide Comodo's BVI counsel with the "written authorities" for them to obtain Mr. Emanuel's tax returns from the relevant U.S. agencies, but ***explicitly held that it was "not approved" that Comodo could obtain the documents in the box or any affidavit detailing the documents.***  (ECF No. 1-14.)[8]  Following that hearing, the BVI Court issued an order on April 12, 2018, stating that the Estate must "send to Comodo's legal representatives . . . all documents .

---

Grp. on Document Retention, *Document Retention Rules for Accounting Firms*, N.J. Soc'y CPAs (Feb. 21, 2019), https://njcpa.org/stay-informed/topics/article/2019/02/21/document-retention-rules-for-accounting-firms.

Additionally, even if the Estate had constructive possession over some of the documents, this would militate against granting the instant Application.  *See Schmitz v. Bernstein Liebhard & Lifshitz, LLP.*, 376 F.3d 79, 85 (2d Cir. 2004) ("Although technically the respondent in the district court was [based in New York], for all intents and purposes petitions are seeking discovery from DT, their opponent in the German litigation.  *Intel* suggests that because DT is a participant in the German litigation subject to German court jurisdiction, petitioner's need for § 1782 help 'is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad.'") (citation omitted).

[5]  Attached hereto as Exhibit A.  As a courtesy, the Estate has included all relevant exhibits herein, even if they were previously filed in this action.

[6]  Attached hereto as Exhibit B.

[7]  Attached hereto as Exhibit C.

[8]  Attached hereto as Exhibit D.

. . received from the" IRS, and to "write to the IRS stating that his requests . . . are urgent."[9]  The BVI Court did not order the Estate to seek any additional documents or other discovery from Mr. Untracht.[10]

This Court should do the same, and not allow Comodo to blatantly circumvent the BVI Court's clear discovery orders in contravention of the third *Intel* factor by belatedly seeking discovery in this Court for the box in Mr. Untracht's possession, the production of which was explicitly rejected in the BVI.  *See In re Microsoft Corp.*, 428 F. Supp. 2d 188, 196 (S.D.N.Y. 2006) (rejecting Section 1782 application because "[t]hrough its current application, [applicant] attempts to divest the [foreign tribunal] of jurisdiction over the matter and replace a European decision with one by this Court," and emphasizing that a U.S. court should not "preempt or contradict a decision by the [foreign tribunal]"); *see also In re Application for Discovery for Use in Foreign Proceeding Pursuant to 28 U.S.C. § 1782*, 2019 WL 168828, at *11 (D.N.J. Jan. 10, 2019) (noting that "a perception that an applicant has 'side-stepped' less-than-favorable discovery rules by resorting immediately to § 1782 can be a factor in the court's analysis" and "a party's failure first to attempt discovery measures in the foreign jurisdiction," and "a party's failure to invoke local discovery procedures remains significant") (internal quotation marks omitted); *In re Escallon*, 323 F. Supp. 3d 552, 560 (S.D.N.Y. 2018) (denying application because it would allow applicant to "have a second bite at the apple"); *INVISTA N. Am. S.a.r.l. v. M&G USA Corp.*, 2013 WL 1867345, at *4 (D. Del. Mar. 28, 2013) ("[T]he Third Circuit and other courts have asked whether a foreign court has denied the moving party access to the documents at issue, in determining whether the instant request amounts to an 'attempt to circumvent' a foreign court's rules.") (citing *In re Chevron Corp.*, 633 F.3d 153, 163 (3d Cir. 2011)).  In stands to reason that the BVI Court's rejection of Comodo's application to obtain the box would extend to other "boxes" that are even more tenuously connected to the BVI litigation.

The fact remains that regardless of who constructively possesses Mr. Untracht's documents, Comodo waited until the eleventh hour to seek these files of which it has had knowledge since late 2017 (at the latest).  As the Estate alerted the Court, the BVI Court recently issued a decision denying Comodo's application to amend its claim in full, and emphasizing that "it would be prejudicial at this late stage to be embarking on a further round of evidence."  (ECF No. 11, 11-1.)[11]  Thus, far from providing assistance to a foreign tribunal, the BVI Court has clearly

---

[9]   Attached hereto as Exhibit E is a true and accurate copy of the April 12, 2018 Order of the BVI Court on the parties' disclosure applications.

[10]   Notably, in that same order, the BVI Court required that the Estate write to another third party, Mr. Votta, "requesting that [he] should immediately deliver up or make available to Mr Katz, the computer, its hard drive (if separate), the computer files . . . and hard copies of the computer files if they have been printed by Mr. Votta."  *Id.*  Similarly, the BVI Court's December 2017 order required the Estate to make inquiries of Alessandra Emanuel, Mr. Emanuel's widow.  These orders stand in stark contrast with the BVI Court's order with respect to Mr. Untracht's documents, which limited the Estate's obligations and declined to require the Estate to seek the additional documents in Mr. Untracht's actual custody beyond the 1998-2002 tax returns.

[11]   Attached hereto as Exhibit F.

stated that further discovery would be particularly unhelpful.  Moreover, instead of seeking relief in the BVI Court (including in two additional disclosure applications Comodo submitted after its January 2018 application), Comodo ran to this Court when it belatedly realized that it had delayed to the point of no return in the BVI and was running out of time before trial.  *See Aventis Pharma v. Wyeth*, 2009 WL 3754191, at *1 (S.D.N.Y. Nov. 9, 2009) (finding application untimely and opining that if the court were to grant it, it "would not be providing 'efficient means of assistance' to the . . . [foreign tribunal] by allowing [applicant] to rush to a U.S. Court on the eve of an appeal in hopes of obtaining discovery it could have requested in this same Court starting over five years ago"); *see also In re Application of Wilander*, 1996 WL 421938, at *4 (E.D. Pa. 1996) (denying application in part because of seven month delay); *Denizbank, A.S. v. ATA Freight Line, Ltd.*, 2008 WL 11438316, at *3 (E.D.N.Y. Mar. 26, 2008) (lapse of four years before bringing application weighed in favor of party circumventing foreign court); *In re Application of Digitechnic*, 2007 WL 1367697, at *4 (W.D. Wash. 2007) ("The current eleventh-hour discovery application seeking discovery never sought  in [the foreign tribunal] certainly appears to be a circumvention attempt on [applicant's] part.").  In fact, Comodo did not even wait for a response from the Estate's BVI lawyers after it contacted them on Thursday, September 6, 2018, instead filing this Application with the Court *ex parte* on Tuesday, September 11, 2018, without any effort to meet and confer on the issue.  Peaty Aff. ¶ 15.

This blatant circumvention of the BVI Court's discovery rulings and procedures, extreme delay in bringing this application, and the BVI Court's recent statements that the introduction of new discovery at this late stage would be highly prejudicial, necessitate that this Court deny Comodo's Application in full and withdraw the subpoena issued to Mr. Untracht.  The Estate looks forward to discussing the issue further at the conference on Tuesday, May 28, 2019 at 11:00 a.m.

Respectfully submitted,

*/s/ Christopher D. Kercher*

Christopher D. Kercher

cc:      Counsel of Record (via ECF)

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

In re Application of

COMODO HOLDINGS LIMITED

              Applicant

Pursuant to 28 U.S.C. § 1782 for Judicial
Assistance in Obtaining Evidence from
DAVID UNTRACHT for Use in a Foreign
Proceeding

Case No. 2:18-CV-13755-JMV

## AFFIDAVIT OF LAUREN PEATY

1.      I am an associate lawyer at the firm Conyers Dill & Pearman of Commerce House, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands, VG1110. I am a legal practitioner of the Eastern Caribbean Supreme Court (Virgin Islands Circuit). I, along with my colleagues, represent Joseph Katz, as Executor of the Estate of Eric D. Emanuel (the "Estate"), and Renaissance Ventures Limited ("Renaissance") in the ongoing proceeding pending in the Eastern Caribbean Supreme Court in the High Court of Justice, British Virgin Islands, Commercial Division, captioned *Comodo Holdings Limited v. Renaissance Ventures Limited and Joseph Katz, as Executor for the Estate of the Late Eric D. Emanuel Deceased*, Claim No. BVI HC (COM) 2013/45 ("BVI Action").

2.      The contents of this witness statement are derived from matters within my own knowledge gained from my firm's case file, conduct of this matter and client instructions. The contents are true to the best of my knowledge, information and belief. No statement made in this affidavit is intended as a waiver of legal privilege with respect to the matters addressed, or at all.

3.      I respectfully submit this affidavit to lay out the relevant facts underlying the BVI

1

Action, as well as a background of the instant discovery dispute.

4.  Comodo Holdings Limited ("Comodo") is a cybersecurity company that provides IT infrastructure and security solutions to a worldwide market incorporated in the BVI.

5.  Eric D. Emanuel ("Mr. Emanuel") was a businessperson who, as the Estate argues, held a signed and sealed share certificate in respect of significant shares in Comodo at the time of his death. Emanuel also served as a director at Comodo from October 28, 2000 until his death. He passed away on October 2, 2006. Until after Mr. Emanuel's death, the Estate argues Comodo never disputed his and his company's, Renaissance, entitlement to Comodo's shares.

6.  Mr. Emanuel met Melih Abdulhayoglu ("Abdulhayoglu"), Comodo's current CEO, in the late 1990s, when Abdulhayoglu pursued Emanuel to raise capital for Comodo. On or about August 17, 1998, Mr. Emanuel, Abdulhayoglu, and Eamonn McManus ("McManus") entered into a subscription agreement providing for the issuance by Comodo to Renaissance of fifty ordinary shares of $1 each in the capital of Comodo at a price of $750,000. Abdulhayoglu, McManus, and Mr. Emanuel then entered into a Joint Venture Agreement ("JVA"), which provided that Owl's Nest (McManus's company), Renaissance, and Abdulhayoglu each owned 50 shares of Comodo, or one-third of the shares of the company.

7.  On October 28, 2000, Comodo executed a written resolution providing for a share split, so that Renaissance, Opal Cavern (Abdulhayoglu's Company) and Owl's Nest each owned 100 million shares of Comodo stock. Comodo accordingly issued Renaissance with share certificate no 6. On June 12, 2003, Mr. Emanuel was allotted shares in Comodo under certificates 35 and 36, and on July 14 2003, Comodo issued share certificate no 37, which was a consolidation of certificates 35 and 36. Share certificate 37 is now held by the Estate. Lists of shareholders created by Comodo prior to Mr. Emanuel's death recorded both Renaissance and

Mr. Emanuel's shares under their respective names.

8.      Comodo alleges in the BVI Action that Renaissance had not paid for the shares with Mr. Emanuel's or Renaissance's own funds, and thus there was no consideration for the shares.  The Estate and Renaissance filed a counterclaim for a declaratory judgment that Comodo recognize the Estate and Renaissance on Comodo's share register.  Even though the Estate and Renaissance each hold signed and sealed share certificates, in 2012, Comodo created a Register of Members that failed to include Renaissance, claiming that it was unable to identify any record of Renaissance having paid Comodo any amount for its shares.

9.      Mr. Untracht served as Mr. Emanuel's accountant.  Comodo issued a discovery application which sought, *inter alia*, various categories of documents from Mr. Untracht dated between 1998 – 2006.  Those categories included but were not limited to Renaissance's tax returns.  In an order dated December 11, 2017, the BVI court directed the Estate and Renaissance to disclose *only* "tax returns of Mr. Emanuel for the years 1998 to 2002, insofar as they are located and produced by Mr. Untracht" (emphasis added).  It did not grant the order for the Defendants to disclose other categories of documents from Mr. Untracht, nor for documents outside the narrowed date range. On December 14, 2017, I contacted Mr. Untracht and informed him that the BVI court asked the Estate and Renaissance to produce Mr. Emanuel's tax returns from 1998-2002 if he was able to locate them.  I followed up on December 20, 2017.  On January 5, 2018, I called Mr. Untracht to again follow up.  Mr. Untracht replied that he had not yet made a detailed search through a box he retrieved from storage.  On January 15, 2018 I again asked Mr. Untracht if he could look for the tax returns.

10.     On January 15 2018, Untracht submitted a witness statement in the BVI Action. On January 29 2018, Comodo served a further discovery application on the Estate and

Renaissance, which sought an order that (i) Mr. Katz file and serve an affidavit explaining the contents of a box that Mr. Untracht had retrieved from storage; and (ii) disclose any relevant documents contained in the box, including Mr. Emanuel's tax returns from 1998 – 2006. This request was made notwithstanding the BVI court's order that the Estate and Renaissance disclose any tax returns for the years 1998-2002.

11.     On January 29, 2018, Mr. Katz requested Emanuel's returns for 1997-1999 from the IRS.  Mr. Katz then requested the tax returns from 2000-2002 on February 8, 2018.  Before doing so, Mr. Katz had to obtain Letters Testamentary.

12.     Again, on February 12, 2018, I followed up with Mr. Untracht about finding the tax returns.

13.     The BVI Court heard Comodo's further discovery application on February 21, 2018. Comodo had, at the hearing on February 21, 2018 appeared to row back on its application, stating that it just wanted the Estate and Renaissance to ask Mr. Untracht for the contents of the box.

14.     The BVI judge made an order the following day, on February 22, 2018 (the "22 February 2018 Order").  That order did require the Estate and Renaissance to make enquiries of other third parties located in the US (including a Mr. Votta).  However it declined to make any order in respect of Mr. Untracht, whether that be for provision of the box or for further enquiries to be made.  In that same order, the BVI court directed the Estate and Renaissance to write to the IRS requesting that the IRS expedite requests Mr. Katz had previously sent on January 29 and February 8, 2018 for tax returns.  It declined to make an order requested by Comodo for enquiries to be made of the New York State tax authority. Comodo did not appeal the 22 February 2018 Order and has not otherwise sought to challenge that disclosure order in the BVI.

15.     Comodo did nothing in relation to seeking disclosure from Untracht for over six months.  On September 6, 2018, it wrote to the Estate's BVI lawyers, asking whether further enquires had been made of Untracht.  Comodo filed this action without waiting for a response on September 11, 2018.  In addition to the tax returns from 1998-2002 and 2006, Comodo now seeks production of all documents in Untracht's possession, regardless of whether they fall within the BVI court's discovery order.

16.     Comodo's actions through the BVI litigation and in bringing this proceeding have been a blatant attempt to delay the scheduled trial in the BVI and circumvent the BVI court's discovery rulings.  Comodo's attempts to delay the trial are not limited to this discovery proceeding.

17.     Directions to trial in the BVI Action were only set after the Estate and Renaissance issued an application for directions in early 2017.  Comodo sought to delay the setting of directions by attempting (unsuccessfully) to adjourn the hearing of that application.

18.     Comodo resisted the Estate and Renaissance's application for discovery of share lists and financial information, leading the Estate and Renaissance to pursue an appeal for the discovery.  That appeal was successful, but at the price of losing the original trial date of March 2018 while the appeal was determined.  The appellate court also awarded the Estate and Renaissance their attorneys' fees and costs incurred during the appeal.

19.     Once the original trial date had been lost, Comodo (unsuccessfully) opposed the Estate and Renaissance's application to set a new trial date.

20.     Comodo has continually failed to comply with its own disclosure obligations in the BVI Action:  for example, Comodo has withheld some documents in general discovery, which were only obtained after the Estate and Renaissance made specific discovery applications.

5

Specifically, Comodo originally withheld an internal e-mail entitled "Share register as of 7[th] Feb 05," and attaching a list or "register" naming the Estate and Renaissance as shareholders in Comodo, which is plainly relevant to the claims in the BVI Action. Comodo continues to fail to comply with its disclosure obligations: for example, it has produced only PDF copies of its share lists, some of which are illegible, and information such as dates have been obscured. To date, it has failed to comply with the Estate and Renaissance's request for native format documents. My firm has made repeated enquiries about the conduct of Comodo's discovery and been met with inadequate responses, which leads the Estate and Renaissance to believe that Comodo's discovery exercise is seriously deficient.

**SWORN** the 6th day of December, 2018 by the
above-named **LAUREN PEATY** at Road Town,
Tortola, British Virgin Islands

**BEFORE ME:**

_____
**NOTARY PUBLIC**

_____
**LAUREN PEATY**





6

# EXHIBIT B

# EXHIBIT E

## Peaty, Lauren

| | |
|---|---|
| **From:** | David Untracht <duntracht@untracht.com> |
| **Sent:** | Wednesday, December 20, 2017 8:54 PM |
| **To:** | Peaty, Lauren |
| **Cc:** | Joe Katz; Forte, Mark |
| **Subject:** | Re: Request for documents - Eric Emanuel |

I had a box retrieved from archive and will look through it in the morning

Sent from my iPhone

On Dec 20, 2017, at 8:14 PM, Peaty, Lauren <Lauren.Peaty@conyersdill.com> wrote:

> Dear David
>
> Please would you let us know if you have any located any tax returns of Mr Emanuel for the years 1998 to 2002.
>
> Kind regards and many thanks
>
> Lauren
>
> **Lauren Peaty** Associate
> lauren.peaty@conyersdill.com  | C +1 (284) 346 1123
>
> <image001.png>
> Conyers Dill & Pearman
> Commerce House, Wickhams Cay 1
> PO Box 3140, Road Town, Tortola
> British Virgin Islands VG1110
>
> conyersdill.com

Conyers Dill & Pearman advises on the laws of Bermuda, the British Virgin Islands, the Cayman Islands and Mauritius.

Confidentiality Notice: The information in this message (and any attachments) is private, privileged and confidential and is intended for the sole use of the recipient(s). If you are not the intended recipient, please notify the sender immediately by replying to the message and then delete the message from your computer.

# EXHIBIT C

# EXHIBIT F

IN THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRGIN ISLANDS
COMMERCIAL DIVISION
CLAIM NO.: BVIHC (COM) 2013/0045

BETWEEN:-

Comodo Holdings Limited

**Claimant**

and

Renaissance Ventures Limited

**First Defendant**

Joseph Katz (as Executor for the Estate of the late
Eric D. Emanuel, deceased)

**Second Defendant**

---

NOTICE OF APPLICATION

---

We, Walkers of 171 Main Street, PO Box 92, Road Town, Tortola, VG1110, on behalf of the Claimant, Comodo Holdings Limited, apply pursuant to rule 28. 5 and 19.2(3) of the Eastern Caribbean Supreme Court Civil Procedure Rules 2000 ("the CPR") and/or the inherent jurisdiction of the court, for orders that:

1.      The Defendants shall make specific disclosure, as follows:

(1)   **Tax Returns of Eric Emanuel ("Mr Emanuel")**

1.1    The Second Defendant ("Mr Katz") shall, within 3 days of the date of this order, complete and send to Walkers the written authorities for Walkers to request Mr Emanuel's Tax Returns and tax filings from the New York State and to the Internal Revenue Service, in the form attached to the letter dated 9 January 2018 from Walkers to Conyers Dill and Pearman ("Conyers"), the Defendants' legal representatives.

1.2    Mr Katz shall, within 3 days of the date of this order, in relation to the box of documents retrieved by Mr Untracht and referred to in ¶7c of Mr Katz's Seventh Affidavit sworn on 27 December 2017 ("Katz 7"):

(a)    file and serve a further affidavit explaining the contents of that box; and

1

18900496.1 C5283,B10654

(b)    give disclosure of any relevant documents contained in that box (including, but not limited to, any Tax Returns and tax filings of Mr Emanuel for the years 1998 to 2006).

(2)    **Mr Emanuel's hard-drive and files**

1.3    Mr Katz shall, within 3 days of the date of this order, in relation to the documents supplied to the Defendants by Mr Votta and disclosed by the Defendants on 6 December 2017:

(a)    file and serve a further affidavit explaining:

(i)    what, if any, enquiries have been made by Mr Katz of Mr Votta in relation to Mr Emanuel's documents held by Mr Votta or as to Mr Votta's possession of Mr Emanuel's hard drive;

(ii)    what, if any, steps have been taken by Mr Katz to inspect the documents, or interrogate the hard drive, held by Mr Votta;

(iii)    to what extent documents relevant to the proceedings are in the possession of Mr Votta, either in hard copy or on the hard drive;

(iv)    how the documents provided by Mr Votta and disclosed by the Defendants on 6 December 2017 were selected for production by Mr Votta (Mr Katz having sought that information from Mr Votta);

(b)    give disclosure of any relevant documents of Mr Emanuel in the possession of Mr Votta, whether in hard copy or electronic form; and

(c)    deliver up to Walkers on behalf of the Claimant the hard drive of Mr Emanuel for the purpose of the hard drive and the documents on it being reviewed and imaged.

(3)    **The Bernard Herold bank accounts**

1.4    The Defendants shall, within 3 days of the date of this order, disclose the Defendants' bank statements and any other relevant documents in their possession from Bernard Herold accounts in the name of Mr Emanuel or Renaissance, including but not limited to accounts # 5M7-032383 and # 5M7-031989, for the period between made 1998 and October 2006.

Alternatively to ¶1.4:

1.5    If the bank statements and other relevant documents referred to in ¶¶1.4 above are not in the Defendants' possession, the Defendants shall, within 3 days of the date of this order, request from Bernard Herold all such bank statements and relevant documents.

1.6     Mr Katz (or his legal representatives) shall promptly send to Walkers (on behalf of the Claimant) copies of (a) all requests for documents sent to Bernard Herold and (b) all responses received from Bernard Herold, following their receipt by Mr Katz.

(4)     **Additional Disclosure**

1.7     The Defendants shall, within 3 days of the date of this order, disclose all relevant documents in their control in the following categories:

    (1)     Documents in the Defendants' possession or control related to any loans to Renaissance and/or Eric Emanuel from Jose Luis Moreno and the repayment of such loans.

    (2)     Documents in the Defendants' possession or control related to Mr Emanuel's acquisition and finance of the Stony Point property and the house in Mexico (as referred to in the Reply Witness Statement of Joseph Katz at ¶20a).

    (3)     All documents relied on by Renaissance in compiling its current shareholder list, including questionnaires, purchase agreements, share transfer documents, stock certificates and stock powers, and other indicia of ownership and all communications respecting such ownership.

    (4)     All documents in the Defendants' possession or control related to the sale of Comodo shares by Mr Katz.

2.      The Defendants shall make available for inspection any documents disclosed by the Defendants under ¶1 above, within 2 days after their disclosure

3.      The Defendants shall pay the Claimant's costs of and occasioned by this application within 14 days, to be assessed if not agreed.

A draft of the order sought is attached.

The grounds of the application are summarised below and are set out in the ninth affidavit of Melih Abdulhayoglu filed in support of the application on 26 January 2018.

1.      The disclosure given by the Defendants in this action has been, and continues to be, deficient and not in accordance with CPR rule 28.

2.      On 11 December 2017 Adderley J ordered the Claimant and the Defendants to make specific disclosure of documents and to verify their disclosure by affidavit "(the Verification Affidavit").

3.      The specific disclosure given by the Defendants following that order is also deficient.

4.      Further, the Verification Affidavit sworn by Mr Katz on 27 December 2017 indicates that there are further grounds on which the Defendants' disclosure is inadequate and a need for further disclosure to be given by the Defendants.

5.    Moreover, the witness statements in answer served on behalf of the Defendants on 15 January 2018 also indicate that the Defendants' disclosure is inadequate and that there is a need for further disclosure to be given by the Defendants.

6.    The documents sought by the Claimant above are directly relevant to the matters in issue in these proceedings.

7.    The evidence establishes that the documents sought are in the possession or control of the Defendants.

8.    Specific disclosure of the documents sought, and the further action provided for in the orders above, are likely to assist the fair disposal of the claim and save costs.

9.    The documents sought are not considered to be subject to legal professional privilege.

10.   The order sought above would not hinder the proceedings or their progress, nor is the cost of the Defendants' compliance with those orders prohibitive.

11.   The Defendants' financial resources are not such as would prevent them from making the specific disclosure sought by the Claimant or complying with the orders sought above.

Dated 26 January 2018

Grant Carroll, Senior Associate
Walkers
Legal Practitioners for the Clamant/Applicant

This Application will be heard by the Judge in Chambers on 21 February 2018 at a time to be specified in the Final Court List for the Commercial Division for the period in question.

**If you do not attend this hearing an order may be made in your absence.**

The Court Office is located at Main Street, Road Town, Tortola, British Virgin Islands, tel no: 284 468 5153, fax no 284 468 5157. The Court Office is open between 8.30am and 4.30pm Monday to Friday except public holidays.

Filed by Walkers, legal practitioners for the Claimant, of 171 Main Street, PO Box 92, Road Town, Tortola, VG1110, tel: 284 494 2204, fax: 284 494 5535, Grant.Carroll@walkersglobal.com, Colleen.Farrington@walkersglobal.com.

4

18900496.1 C5283.B10654

# EXHIBIT D

# EXHIBIT L

IN THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRGIN ISLANDS
(COMMERCIAL DIVISION)

CLAIM NO. BVIHC(COM) 0045 OF 2013

BETWEEN:

COMODO HOLDINGS LIMITED )
)
                                    Claimant )
)
            AND )
)
(1) RENAISSANCE VENTURES LIMITED )
(2) JOSEPH KATZ (as Executor of )
    the Estate of the late )
    ERIC D EMANUEL Dec'd) )
)
                                    Defendants )
)

TRANSCRIPT OF CHAMBERS PROCEEDINGS

Thursday, 22nd February, 2018
2:30 p.m. to 2:57 p.m.

BEFORE: HON. JUSTICE K. NEVILLE ADDERLEY, Judge (Ag.)

Court Reporting Unit
Government of the British Virgin Islands
Road Town, Tortola
British Virgin Islands
COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

```
APPEARANCES:   WALKERS
               Chambers
               Road Town, Tortola
               British Virgin Islands
               BY:  MR. GRANT CARROLL
               For the Claimant

               CONYERS DILL & PEARMAN
               Chambers
               Road Town, Tortola
               British Virgin Islands
               BY:  MS. LAUREN PEATY
               For the Defendant
                    * * *
```

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

3

1                    AFTERNOON PROCEEDINGS

2                         * * *

3              (Matter resumes at 2:30 p.m.)

4              THE COURT:              Okay.

5              MR. CARROLL:            Good afternoon,

6      judge.

7              THE CLERK:              BVIHCM 45 of

8      2013 - Comodo Holdings Limited against Renaissance

9      Ventures Limited and Others.

10             THE COURT:              You have a copy

11     of the Draft Order?

12             MR. CARROLL:            I do, My Lord.

13             THE COURT:              I'll give you

14     yours back, the ones you gave me.  I did actually find

15     mine.  I found that it was -- I didn't realise it was

16     so many pages.

17             MR. CARROLL:            Thank you, My

18     Lord.

19             Well, My Lord, I think I've got yours.

20             THE COURT:              You have mine?

21             MR. CARROLL:            I'm not sure.

22             THE COURT:              Let me see,

23     please.  You have an extra one that you can use.

24             MR. CARROLL:            I do.

25             You're now in the position of having two.

4

| | | |
|---|---|---|
| 1 | THE COURT: | Sorry? |

MR. CARROLL:          You're now in
the position of having two.

THE COURT:          I am going to
make it brief.  As you know, I'm in the middle of a
hearing, and so I'm just going to refer to the sections
so you can make your note on the draft that you have.

MR. CARROLL:          Thank you, My
Lord.

THE COURT:          And hopefully
you will be clear.

The first one on the draft, it speaks to,
on page 2 -- it's under (a) on "Comodo's Specific
Disclosure Application".

MR. CARROLL:          The tax returns
bit, My Lord.

THE COURT:          Yes.

Number (1) is tax returns of Mr. Katz,
and 1.1 is approved.  That's (a) and (b).

1.2 (a) and (b) is not approved.

MR. CARROLL:          So 1.2
disallowed, My Lord?

THE COURT:          Disallowed, yes
disallowed.

When I say "not approved" it means

5

1    disallowed.

2                  1.3 is disallowed.

3                  MR. CARROLL:              In its entirety

4    at (a), (b) and (c)?

5                  THE COURT:                1.3 is

6    disallowed.  1.3 (a), (b).  Does it have a (c)?

7                  1.3 (a), (b).  Yes, (a), (b) and (c)

8    disallowed.

9                  Thank you.

10                 And then 1.  Sorry 2, which is

11   Mr. Emanuel's hard-drive.

12                 MR. CARROLL:              Looks like the

13   numbering has gone awry, My Lord.

14                 THE COURT:                The rubric is

15   "Mr. Emanuel hard-drive and files".

16                 That's approved.

17                 MR. CARROLL:              Yes, My Lord.

18                 THE COURT:                Allowed.

19   That's 1.3, (a), (b) and (c).

20                 And (3) which says "Bernard Herold bank

21   accounts", that's approved.

22                 I understand that's already been dealt

23   with, but it's just for the record.

24                 And that would be 1.4, 1.5 and 1.6 are

25   allowed.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

6

1            And then (4) which deals with "Additional

2  Disclosure", that's approved, and that would include

3  under -- I'm not sure how this wording went, the

4  numbering went, but the numbering on the Draft Order is

5  1.7.

6            MR. CARROLL:            Yes, My Lord,

7  yes.

8            THE COURT:            And then there

9  is (1).

10            MR. CARROLL:            (1) and (2).

11            THE COURT:            And then number

12  (5), "Orders consequent on the Defendants' further

13  disclosure on 19th of February, 2018," that's approved.

14  However, the date -- "The Claimant is to file and serve

15  further witness statement evidence dealing with the

16  Defendants' 19th February disclosure", further

17  disclosure within 10 days instead of 14.

18            MR. CARROLL:            Thank you, My

19  Lord.

20            THE COURT:            And then 1.9(a)

21  is approved.   That is confirming Ms. Lady's evidence.

22  Fees, I'm sorry.

23            And (b) is also approved, (a) and (b).

24            And then C --

25            There's nothing under B, capital B?

7

1           MR. CARROLL:              No, My Lord.

2    That was this morning's judgment.

3           THE COURT:                And C, (3)

4    under C is approved, and the other one, of course, 3.4

5    with respect to costs, costs reserved.

6           MS. PEATY:                My Lord,

7    forgive me, but I didn't have much time.  There's just

8    two points of clarification.  One was this morning we

9    were talking about the timetable that we would be able

10   to provide a witness statement, and I think we sort of

11   agreed that it would match, or maybe we didn't agree.

12   My friend will tell me.

13          THE COURT:                Yes.  I thought

14   you were agreed.  Is there a problem?

15          MS. PEATY:                So that would

16   be (3) from this morning for the Defendants to be given

17   time to file and serve supplemental witness statements,

18   if necessary, in connection with any documents

19   disclosed or any redactions.  But we don't have a

20   redaction anymore.  So that point falls away.  We'll

21   scribble that out.

22          THE COURT:                It seems like

23   you were on the same page on that.

24          MR. CARROLL:              I think Your

25   Lordship approved C(3), which we have to do in two

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

8

1  days.

2          THE COURT:                That's what you

3  asked for.

4          MR. CARROLL:              No.  I think my

5  learned friend asked for that in their orders.

6          MS. PEATY:                I would like to

7  make the point that under additional disclosure 1.7(2),

8  which is on the fourth page, so that's the one that

9  reads:

10          "All documents relied on by Renaissance

11  in compiling its current shareholder list, including

12  questionnaires, purchase agreements, share transfer

13  documents, stock certificates and stock powers and

14  other indicia of ownership and all communications

15  reflecting such ownership."

16          That is going to require probably quite

17  an extensive search of all the e-mails going back over

18  11 years or so.

19          THE COURT:                Oh, you see, I

20  have a note here, Mr. Chaisty saying it's going to take

21  a lot of time.

22          Now with the trial coming up, you think

23  that's going to take too much time; is it?

24          MR. CARROLL:              My learned

25  friend can have five days instead of two, if that would

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1   assist.  That would still allow time beforehand.

2           MS. PEATY:          It is quite a

3   wide-ranging obligation that we will have under that

4   one, and actually going much further than the

5   disclosure that the Claimants have to give of their own

6   share list.  So, of course, we'll comply with any order

7   made, but if we can put down a marker that we may need

8   to apply for an extension depending on how we get along

9   with that.  It's any communication reflecting the

10  ownership of Renaissance, which is the second --

11          THE COURT:          I see.  I don't

12  think -- I think the point was made but didn't register

13  as to how much time that was going to take.

14          MR. CARROLL:          My Lord,

15  perhaps if we have a look at it --

16          THE COURT:          Is it

17  necessary?

18          MR. CARROLL:          We say so, yes,

19  My Lord.

20          THE COURT:          Why is it

21  necessary?

22          MR. CARROLL:          Renaissance on

23  our case was dealt with as a pass through company.

24          THE COURT:          Yes.  So you

25  want to see really who purchased shares purporting to

10

1   be Comodo's shares or some other shares.  So I can see

2   where that's directly relevant.  It's probably

3   necessary, and so it probably fits in under CPR 2.5.5

4   as well as CPR 2.6.

5            Maybe it could be limited somewhere.

6            MS. PEATY:            In our

7   submission, My Lord, the shareholder lists of

8   Renaissance are surely no more relevant than Comodo's

9   shareholder list, which is disclosed in an extremely

10   redacted form.  So although we're not asking for

11   redaction, we're not particularly sensitive about

12   redaction of shareholder lists in circumstances where

13   the case is about the ownership of Comodo, and we

14   struggle still to see the relevance of our shareholder

15   list.

16            THE COURT:            From the way I

17   understand the claims, it is relevant.

18            MR. CARROLL:            My Lord, if you

19   were thinking in terms of time --

20            THE COURT:            Yes, I was

21   thinking in terms of time.

22            MR. CARROLL:            -- seven days

23   will take us to 1st of March, and the trial starts 13th

24   of June, which is two weeks.  I'll allow my friend some

25   additional time.  It puts us under a little bit more

11

1  pressure, but --

2          THE COURT:              I think she

3  will know.  She probably has an idea of how long this

4  would take, which I did take note of it.

5          I think the point that Mr. Chaisty was

6  making is that it's rather late.  And so that has to be

7  taken into consideration.  It's kind of late in the

8  game, but I was persuaded more by the relevance of it.

9          MR. CARROLL:              And, My Lord,

10  in terms of the evidence, we were cross-examining my

11  learned friend's witnesses in the week of, I think the

12  19th, the way it works, and we could ask (unclear) our

13  witnesses go first, then documents would be (unclear)

14  to witnesses in that second week, and our closings to

15  Your Lordship.

16          THE COURT:              Can you remind

17  me what was the volume of (unclear) for the day?

18          MR. CARROLL:              I'm afraid --

19          THE COURT:              You have any

20  idea who these people are?

21          MS. PEATY:              I'm trying to

22  remember how many share certificates there are of

23  Renaissance.  I don't want to give an answer because

24  I'm uncertain.

25          THE COURT:              No.  Just give

12

1   me a ballpark.

2           MS. PEATY:           The point that

3   we struggle with, and I appreciate Your Lordship also

4   made a point as to relevance, but the siphoning off

5   claim has actually been struck out, and I can take you,

6   if you're minded, to the Order of Justice Bannister

7   where he struck out points of claim dealing with

8   Renaissance siphoning off money from --

9           THE COURT:           That wasn't

10  brought to my attention.  No one mentioned that.

11          MR. CARROLL:          But, My Lord,

12  we're in a situation, quite unusual, where the

13  relevance is being decided, the order made.

14          THE COURT:           My view is it's

15  relevant as it is, but it's --

16          MR. CARROLL:          I wonder how

17  much time my learned friend thinks they require to

18  comply with this order.

19          MS. PEATY:           So to comply

20  with this order we will need to make physical searches

21  of papers, and so I suspect for Mr. Katz's e-mails,

22  they would be in New York.  Mr. Katz is currently in

23  Israel.  He may be able to do that, but it's also his

24  e-mails.  The point, looking at it from a practical

25  point of view, is he's an executor of Renaissance for

13

1    --

2              THE COURT:                    A long time.

3              MS. PEATY:                    And so anything

4    about Renaissance ownership -- oh, I wonder, My Lord,

5    if we're thinking of ways to limit it, if the relevancy

6    is that, how Renaissance's shareholding was held at a

7    particular point in time, perhaps that might help

8    rather than launch into the ether.

9              THE COURT:                    The relevant

10   time would be the period of time during which he wanted

11   to be taking in monies for these shares, for a period

12   of time, a long period of time.

13             MS. PEATY:                    2006 maybe.

14   But, My Lord, that would be before my client took

15   office as executor.  So he could look at some paper

16   files for that.

17             MR. CARROLL:                  Yes.  And, of

18   course, it would be from whenever Renaissance was set

19   up, from when Renaissance was incorporated to carry out

20   its role that a third party ought to take, where it's

21   set up, how it got from where it initially started to

22   the current situation.  So we're hearing Mr. Katz to do

23   a search in the e-mails.  He has employees.  We're not

24   saying it isn't doable.  We want to know how long it's

25   going to take.

14

1          THE COURT:                That's the

2   point.  I'm asking how long it will take.

3          MS. PEATY:                Well, perhaps

4   it could be limited to up to the date of say

5   Mr. Emanuel's death.

6          THE COURT:                Because he

7   would have been the one doing these transactions,

8   correct?

9          MS. PEATY:                Yes.  And

10  clearly there's no suggestion Mr. Katz has been.

11         MR. CARROLL:              Well, Mr. Katz

12  continued --

13         MS. PEATY:                We shouldn't be

14  speaking to each other across the table.

15         THE COURT:                I think the

16  idea, as I understood it, Mr. Emanuel was selling

17  shares purporting them to be Comodo shares, but he was

18  giving them some other shares.  Is that it or not?

19         MR. CARROLL:              He was giving

20  them Renaissance shares, yes, My Lord.

21         THE COURT:                Right.  So that

22  means, I think, it really would naturally be up to the

23  time of his death.  That seems to be natural.  I mean

24  you wouldn't be talking about something after his

25  death.

15

1           MS. PEATY:           Then we will be

2  able to do it within five days.

3           THE COURT:           Yes.  That was

4  the intention of the Court, to deal with these things

5  that Mr. Emanuel was purportedly selling, you know, in

6  this way, and that also fits in with the pleadings, you

7  see.

8           MR. CARROLL:           Okay.

9           THE COURT:           Yes, so, and

10  that was tied into the pleading, and that's why I

11  thought it was very relevant.

12           MR. CARROLL:           Well, that, My

13  Lord --

14           THE COURT:           I thought it

15  was relevant.  It was tied into the pleading, and so I

16  think that suggestion, within five days, I'm going to,

17  in light of the changed circumstances, what the

18  intention of the Court was, I'm going to limit it up to

19  the time of his death, okay.

20           MR. CARROLL:           Understood.

21           THE COURT:           And she said

22  five days.  That bit is fine.

23           Let me just make a note on my records

24  here. I hope that this -- 1.7(2) up to the time of his

25  death.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

16

```
 1              MR. CARROLL:              So, My Lord,
 2    myself and my learned friend, 1.7(1) is three days, and
 3    1.7(2) will be amended to reflect the fact that it's
 4    timeously limited up to the point of Mr. Emanuel's
 5    death and such documents to be supplied within five
 6    days.
 7              THE COURT:              Okay.
 8              MR. CARROLL:              Thank you, My
 9    Lord.
10              THE COURT:              Thank you.
11    Thank you for that.
12              MS. PEATY:              Thank you for
13    accommodating us.
14              THE COURT:              You don't want
15    an order that doesn't make sense, and was not intended.
16              (Thereupon, Matter adjourns at 2:57 p.m.)
17                        * * *
18
19
20
21
22
23
24
25
```

17

1                    REPORTER'S CERTIFICATE

2

3          I, PETULA V. STOUTT, a Certified Court

4   Reporter, do hereby certify:

5          That on the 22nd day of February, 2018 the

6   foregoing proceedings were taken down by me in machine

7   shorthand, consisting of 17 pages herein; that the

8   foregoing is a true and correct transcript of the

9   proceedings had.

10         That I am not an attorney, relative, or

11  employee of any party hereto, or otherwise interested

12  in the events of this cause;

13         IN WITNESS WHEREOF, I have hereunto

14  affixed my signature at Road Town, Tortola, British

15  Virgin Islands, this 5th day of September, 2018.

16

17

18

19

20                              PETULA V. STOUTT
                                Certified Court Reporter

21

22

23

24

25

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

# EXHIBIT E

IN THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRGIN ISLANDS
COMMERCIAL DIVISION
CLAIM NO.: BVIHC (COM) 2013/0045



FEE STAMPS ON
ORIGINAL
25

The Hon. Justice Adderley

Wednesday 21 February 2018

BETWEEN:-

Comodo Holdings Limited

Claimant

and

Renaissance Ventures Limited

First Defendant

Joseph Katz (as Executor for the Estate of the late
Eric D. Emanuel, deceased)

Second Defendant

---

ORDER

---

BEFORE:    The Honourable Mr Justice Neville Adderley

DATED:      22 February 2018

ENTERED:   12th April February 2018

UPON THE APPLICATIONS for orders for specific disclosure (i) by the Claimant ("**Comodo**") by Notice of Application dated 26 January 2018 pursuant to CPR r 28.5 ("**Comodo's Specific Disclosure Application**") and (ii) by the Defendants by Notice of Application dated 18 January 2018 pursuant to CPR r 28.5, r 28.13 and 28.16 (the "**Defendants' Specific Disclosure Application**") (together the "**Specific Disclosure Applications**")

AND UPON HEARING leading counsel for Comodo (Vernon Flynn QC) and for the Defendants (Paul Chaisty QC)

1

**AND UPON READING** the evidence

**IT IS ORDERED** that:

A       **On Comodo's Specific Disclosure Application**

The Defendants shall make specific disclosure, as follows:

(1)     **Tax Returns of Eric Emanuel ("Mr Emanuel")**

1.1     The Second Defendant ("**Mr Katz**") shall:

(a)     send to Comodo's legal representatives, Walkers ("Walkers") on behalf of Comodo, all documents (including, for the avoidance of doubt, all tax returns of Mr Emanuel and all correspondence) received from the Internal Revenue Service ("IRS") in response to Mr Katz's requests for the production of Mr Emanuel's tax returns dated 29 January 2018 and 8 February 2018, forthwith upon receipt by Mr Katz of any such document from the IRS; and

(b)     forthwith write to the IRS stating that his requests dated 29 January 2018 and 8 February 2018 are urgent, explaining that the requested tax returns are required in advance of a court hearing in the BVI commencing on 13 March 2018, and asking that the production of the tax returns be expedited (a copy of which letter and the response thereto from the IRS should be sent to Walkers for Comodo immediately upon them being sent and received by Mr Katz, respectively).

(2)     Mr Emanuel's hard-drive and files

2.1     Mr Katz shall, within 3 days of the date of this order, in relation to the documents supplied to the Defendants by Mr Votta and disclosed by the Defendants on 6 December 2017:

(a)     write to Mr Votta, requesting that Mr Votta should immediately deliver up or make available to Mr Katz, the computer, its hard drive (if separate), the computer files (either stored on the hard drive or separately, if they have been copied and stored elsewhere) and hard copies of the computer files if they have been printed by Mr Votta;

(b)     send to Walkers for Comodo, a copy of Mr Katz's letter to Mr Votta and Mr Votta's response thereto, immediately upon them being sent and received by Mr Katz, respectively; and

2

(c)     disclose to Comodo the computer, its hard drive (if separate), the computer files (either stored on the hard drive or separately, if they have been copied and stored elsewhere) and hard copies of the computer files, as are produced by Mr Votta to Mr Katz.

(3)     **The Bernard Herold bank accounts**

3.1    The Defendants shall, within 3 days of the date of this order, disclose the Defendants' bank statements and any other relevant documents in their possession from Bernard Herold accounts in the name of Mr Emanuel or Renaissance, including but not limited to accounts # 5M7-032383 and # 5M7-031989, for the period between made 1998 and October 2006.

Alternatively to ¶3.1:

3.2    If the bank statements and other relevant documents referred to in ¶3.1 above are not in the Defendants' possession, the Defendants shall, within 3 days of the date of this order, request from Bernard Herold all such bank statements and relevant documents.

3.3    Mr Katz (or his legal representatives) shall promptly send to Walkers (on behalf of the Claimant) copies of (a) all requests for documents sent to Bernard Herold and (b) all responses received from Bernard Herold, following their receipt by Mr Katz.

(4)     **Additional Disclosure**

4.1    The Defendants shall, disclose all relevant documents in their control in the following categories:

(a)     Within 3 days of the date of this order, documents in the Defendants' possession or control related to Mr Emanuel's acquisition and finance of the Stony Point property and the house in Mexico (as referred to in the Reply Witness Statement of Joseph Katz at ¶20a).

(b)     Within 5 days of the date of this order, all documents dating up to the date of Eric Emmanuel's death on 6 October 2006 relied on by Renaissance in compiling its current shareholder list, including questionnaires, purchase agreements, share transfer documents, stock certificates and stock powers, and other indicia of ownership and all communications respecting such ownership.

(5)     **Orders consequent on the Defendants' further disclosure on 19 February 2018**

3

5.1   The Claimant has permission to file and serve further witness statement evidence dealing with the further disclosure produced by the Defendants on 19 February 2018, within 10 days.

5.2   The Defendants shall, within 3 days of the date of this order:

(a)   write to Alessandra Emanuel ("**Mrs Emanuel**"), requesting Mrs Emanuel forthwith to swear an affidavit verifying the contents of paragraphs 13-15 inclusive of the fifth affidavit of Lauren Peaty sworn on 19 February 2018 on behalf of the Defendants; and

(b)   send to Comodo copies of all correspondence with Mrs Emanuel concerning the verification affidavit, forthwith upon the Defendants, or Conyers coming into possession of the correspondence.

B      **On the Defendants' Specific Disclosure Application**

(1)   The Claimant does within 3 days make specific disclosure of documents hereinbefore specified in correspondence dated 12 January 2018 from Messrs Conyers to Messrs Walkers summarized herein ("**the Documents**") by filing and serving a supplemental list of documents on the Defendants, including:

(a)   All bank statements for any accounts of Comodo Research Lab Limited and Comodo Group Inc. into which Comodo received funds from Renaissance or Mr Emmanuel. The bank statements may be redacted to show only the payments received from Mr Emanuel and Renaissance.

(b)   The covering e-mails to which the documents COMODO00000644-COMODO00000703 were attached.

(2)   The Claimant does make available for inspection the Documents within 2 days thereafter.

(3)   The Defendants be given leave to file and serve supplemental witness statements (if necessary) in connection with any documents disclosed within 10 days after such disclosure or inspection.

4

C       **On both Specific Disclosure Applications**

1.      The parties shall make available for inspection any documents disclosed under this Order, within 2 days after their disclosure

2.      Costs are reserved until trial.


BY THE COURT


_____

By REGISTRAR

5

**THE EASTERN CARIBBEAN SUPREME COURT**
**IN THE HIGH COURT OF JUSTICE**
**VIRGIN ISLANDS**
**COMMERCIAL DIVISION**
**CLAIM NO.: BVIHC (COM) 2013/0045**

**The Hon. Justice Adderley**
**Wednesday 21 February 2018**

**BETWEEN:-**

**Comodo Holdings Limited**

<u>**Claimant**</u>

**and**

**Renaissance Ventures Limited**

<u>**First Defendant**</u>

**Joseph Katz (as Executor for the Estate of the late**
**Eric D. Emanuel, deceased)**

<u>**Second Defendant**</u>

---

**ORDER**

---



**Conyers** Dill & Pearman

**Legal Practitioners for the Defendants**

Commerce House, Wickhams Cay 1
PO Box 3140, Road Town, Tortola
British Virgin Islands VG1110
Tel: +1 (284) 852 1000
Fax: +1 (284) 852 1001
alecia.john@conyersdill.com

# EXHIBIT F

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 | FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7263**

WRITER'S INTERNET ADDRESS
**christopherkercher@quinnemanuel.com**

April 19, 2019

<u>VIA ECF</u>

> Honorable John Michael Vazquez
> United States District Court
> District of New Jersey
> Martin Luther King Building and U.S. Courthouse
> 50 Walnut Street,
> Newark, New Jersey 07102

Re:     Supplemental Authority in Further Support of Motion to Intervene, *In re Application of Comodo Holdings Limited Pursuant to 28 U.S.C. § 1782 for Judicial Assistance in Obtaining Evidence from David Untracht for Use in a Foreign Proceeding*, No. 2:18-CV-13755 (D.N.J.)

Dear Judge Vazquez:

    We write on behalf of Proposed Intervenor Joseph Katz, as Executor of the Estate of Eric D. Emanuel (the "Estate"), in the above-captioned proceedings, to alert the Court to supplemental authority in further support of the Estate's Motion to Reopen and to Intervene (ECF No. 3).  On April 15, 2019, the Eastern Caribbean Supreme Court in the related BVI Action[1] issued a Judgment (the "Decision") in which it opined on Comodo's U.S. discovery efforts and intimated that it would not be receptive to additional discovery at this late stage in the BVI Action.[2]

    The Decision denies Comodo's November 20, 2018 application to amend its claim in the BVI Action (the "Amendment Application").  The BVI Court's reasoning in denying the

---

[1]  "BVI Action" refers to the foreign proceeding for which Comodo seeks to obtain discovery, captioned *Comodo Holdings Limited v. Renaissance Ventures Limited and Joseph Katz, as Executor for the Estate of the Late Eric D. Emanuel Deceased*, Claim No. BVI HC (COM) 2013/45.

[2]  A copy of the Decision is attached hereto as Exhibit A.  Specifically, the Estate refers the Court to paragraphs 2, 79, 81, and 83-84 of the Decision.

Amendment Application reveals the Court's concern regarding the late stage of the proceedings and its unwillingness to entertain further discovery. Indeed, the Court expressly notes its disapproval of Comodo's efforts to obtain discovery in the United States through Section 1782 applications.

If this Court grants the Estate's motion to intervene, it will move to quash the subpoena issued to David Untracht pursuant to 28 U.S.C. § 1782. When analyzing whether to quash a subpoena pursuant to § 1782, courts look to the four factors in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004). Relevant here, the Decision confirms that the second and third *Intel* factors weigh heavily in the Estate's favor, as (1) the BVI Court will not be receptive to the sought-after discovery and would be unlikely to excuse the extreme delay that could jeopardize the imminent trial date, and (2) Comodo is seeking to circumvent the BVI Court by waiting until the eleventh hour to obtain this discovery. One of the very first things the BVI Court notes is the Amendment Application's proximity to the trial date:

> The odd thing about this application is the timing of it . . . . The proximity of the new trial date to the hearing of and judgment on this application is a matter that concerns me and . . . will be something that I am bound to take into account in balancing the factors for and against the grant of permission.

(Decision ¶ 2.) The BVI Court notes that there is no adequate explanation for the Amendment Application's lateness, and that amending the claim could threaten the trial date, ***particularly if new evidence is introduced***. (*See id.* ¶¶ 79, 81, 83-84.) Similarly here, Comodo waited six months after an adverse discovery ruling in the BVI Action to bring the instant 1782 Application.

Moreover, the BVI Court opines that allowing further discovery applications in the BVI of any kind could create a snowball effect and would almost certainly sacrifice the trial date. The BVI Court is not willing to risk another trial date, and provides express disapproval of Comodo's spree of Section 1782 applications:

> [I]t seems that Comodo has been engaged on an evidence gathering exercise in the US, partly to try to obtain further evidence to support its case as to the role of Renaissance. I do not see why the [Estate] should not also be entitled fully to explore the issue of Renaissance's role by seeking evidence from other investors who obtained their shares through the Defendants. The amendments bring this point sharply into focus and ***so it would be prejudicial at this late stage to be embarking on a further round of evidence***. It could threaten the trial date, which both parties say they have no intention of doing, but it is not inconceivable that applications would be mounted on the back of my grant of permission to amend, for disclosure, and other evidence.

(Decision ¶ 81 (emphasis added).) This further evinces the BVI Court's reluctance to allow the parties to seek to introduce any additional discovery before the impending trial.

**quinn emanuel urquhart & sullivan, llp**
LOS ANGELES | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE | LONDON | TOKYO | MANNHEIM | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH

Accordingly, for the reasons set forth in the Estate's Motion to Intervene, and the BVI Court's concerns in the Decision, we respectfully request that this Court grant the Estate's Motion to Intervene so that it may move to quash the subpoena.

Respectfully submitted,

*/s/ Christopher D. Kercher*

Christopher D. Kercher

cc:     Counsel of Record (via ECF)

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE | LONDON | TOKYO | MANNHEIM | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH

# EXHIBIT A

IN THE EASTERN CARIBBEAN SUPREME COURT

THE TERRITORY OF THE VIRGIN ISLANDS

### IN THE HIGH COURT OF JUSTICE
### (COMMERCIAL DIVISION)

CLAIM NO: BVIHC (COM) 0045/2013

BETWEEN

### COMODO HOLDINGS LIMITED

**Claimant/Applicant**

**and**

### [1] RENAISSANCE VENTURES LIMITED
### [2] JOSEPH KATZ (as the Executor of the Estate of the late Eric D Emanuel Deceased)

**Defendants/Respondents**

**Appearances:**

Mr Adrian Francis with Mr Simon Hall and Mr Carl Moran of Maples and Calder for the Claimant/Applicant

Mr Paul Chaisty QC with Mr Mark Forte, Ms Lauren Peaty and Dr Alecia Johns of Conyers Dill & Pearman for the Defendants/Respondents

———————————

2019: March 18
2019: April 15

———————————

## JUDGMENT

[1]     **GREEN QC, J. [Ag.]:** This is a contested application by Comodo Holdings Limited
("**Comodo**"), the Claimant in this action, for permission to amend its statements of case, that is
the Claim Form[1], the Re-Amended Points of Claim and the Re-Amended Points of Reply and
Defence to Counterclaim.

[2]     The odd thing about this application is the timing of it: the trial in this matter was listed to be
heard from 13 March 2018 but for various reasons that date had to be vacated; the relisted trial
is due to commence on 25 June 2019 with a time estimate of 12 days. No similar application
was made by Comodo before the expected trial last year and it was ready to proceed with the
trial on its existing pleadings. The application is based on "*new*" evidence that was available
before last year's trial and was relied on heavily by Comodo in terms of the way it was going to
present its case at the trial. The first time Comodo suggested that it wished to amend its
pleadings was towards the end of October 2018 and this application was issued on 20
November 2018. The proximity of the new trial date to the hearing of and judgment on this
application is a matter that concerns me and, despite Mr Francis' submissions to the contrary
on behalf of Comodo, will be something that I am bound to take into account in balancing the
factors for and against the grant of permission.

[3]     Mr Francis, throughout his submissions, stressed that the proposed amendments were merely
a "*tidying up exercise*" or "*tweaking*"; that Comodo's case was already "*tolerably clear*"; that
there was "*nothing new*" in them; and even that it was not "*necessary*" to make the
amendments. One might be forgiven for wondering why, if the amendments are not
"*necessary*", such an application is being made so close to the trial and when it would be
known that it would be vigorously opposed by the Defendants (as everything is in this case). Mr
Francis' answer to that question is that, based on the fact that every point is taken in these
proceedings, Comodo is trying to ensure time is not wasted at the trial on procedural objections
by the Defendants that the case being made by Comodo is not properly pleaded. I rather doubt
that, even if I was to grant permission to amend, this will avoid such points being taken at the
trial but that appears to be the sole purpose of the application.

---

[1] The Amendments to the Claim Form were mistakenly left out of the Application Notice but no point is taken
on that.

[4]     Mr Paul Chaisty QC on behalf of the Defendants says, by contrast, that these are significant amendments that Comodo is seeking to make and cannot be described as a "*tidying up exercise*"; they give rise to limitation issues and are in any event not coherent; and are very late and, taking into account the procedural history, should not be allowed. Perhaps predictably, Mr Chaisty QC says that, if the amendments are allowed, they will cause the Defendants serious prejudice in terms of disclosure and that the trial date will be threatened. Mr Francis says that the alleged prejudice has been exaggerated by the Defendants.

**The Claim**

[5]     Comodo is a leading cybersecurity firm whose shares are presently very valuable. It was incorporated in the British Virgin Islands ("**BVI**") under the International Business Companies Act 1984, later re-registered under the Business Companies Act 2004 ("the **Act**"). In 1998, Comodo was acquired by Mr Melih Abdulhayoglu who is its current President. A little later Mr Abdulhayoglu was introduced to Mr Eric Emanuel as a possible investor. Mr Emanuel's investment vehicle was Renaissance Ventures Limited, the First Defendant ("**Renaissance**") and it entered into a Subscription Agreement in January 1999 to subscribe for 50 shares in Comodo for a total price of $750,000, payable by instalments. The money was paid and the shares were issued to Renaissance. The dispute concerns, in broad terms, whether the money came from Mr Emanuel personally or from third party investors. Mr Emanuel was appointed as a director of Comodo on 28 October 2000.

[6]     Further shares were issued by Comodo to Mr Emanuel in 2003 on the basis of representations that Renaissance had loaned monies to Comodo and the shares were by way of discharge of Comodo's liability under those loans. Comodo claims that such representations were false.

[7]     There is no evidence that a share register was being maintained at the time and neither Renaissance nor Mr Emanuel was entered as members on any share register of Comodo. Mr Emanuel has since died and the Second Defendant, Mr Joseph Katz, is the executor of Mr Emanuel's estate, and is sued in that capacity.

[8]     The current Claim Form and Re-Amended Points of Claim seek very simple relief: declarations that Renaissance and Mr Emanuel are not members of Comodo. The Re-Amended Points of Claim are just two paragraphs long and assert that the Defendants are not members of

Comodo because they did not pay for any shares or share certificates issued in their name or to their benefit and they are not entered on Comodo's share register. The Defendants have counterclaimed for rectification of Comodo's share register under s.43 of the Act as they say that they are rightfully in possession of 4 share certificates issued by Comodo in their names: share certificate no.6 in the name of Renaissance; and share certificates nos. 35, 36 and 37 in the name of Mr Emanuel (together the "**Disputed Shares**").

[9]     It is in the Amended Reply and Defence to Counterclaim that one finds the substance of Comodo's case. In that, Comodo pleads that it was wrongly induced to issue the Disputed Shares pursuant to false representations in particular that Mr Emanuel was a wealthy individual who would be investing his own money in Comodo. Comodo also pleads that Comodo entered into a joint venture agreement with Mr Emanuel whereby he would secure further investment from third parties into Comodo. Comodo's case is that Renaissance and Mr Emanuel did not use their own money to subscribe for the Disputed Shares but rather they used money derived from third party investors who thought they were investing directly in Comodo. As their money was used by Renaissance/Mr Emanuel, Comodo says it was deprived of the extra investment from those third parties and that Mr Emanuel had failed to secure that extra investment was paid to Comodo. In relation to the other Disputed Shares, Comodo pleads that Renaissance did not loan its own or Mr Emanuel's money to Comodo and so the shares were wrongly issued to Mr Emanuel.

**Procedural History**

[10]    It is important to consider the application in the context of the long procedural history of the claim and in particular the way the pleadings have evolved and been dealt with over time. As this application is being heard shortly before the trial, this seems to me to be highly relevant to understanding the purpose and basis of the proposed amendments.

[11]    The proceedings began by way of Fixed Date Claim Form[2] as long ago as 19 April 2013. As originally issued the Claim Form sought declarations that:

---

[2] I assume this is why the Pleadings are Points of Claim and Defence – they were effectively converted into ordinary proceedings

(1) Comodo was entitled to treat the holders of registered shares (i.e. not the Defendants) as the only persons entitled to exercise rights and powers attaching to the shares

(2) As to whether a sealed stock certificate creates a presumptive proof of ownership;

(3) As to whether an arbitral tribunal would have jurisdiction if constituted by a non-member.

[12]    The Claim Form was amended on 3 May 2013 merely to add specific reference to the Defendants.

[13]    The original Points of Claim is dated 6 May 2013. It is considerably longer than its current form setting out the history of the matter, certain representations of Mr Emanuel that were relied upon and claiming that the Disputed Shares were null and void because there was no proof that either Renaissance or Mr Emanuel ever paid for them. The assertion was that they had used third party investors' money, not their own, to subscribe for the shares. The same relief as in the Claim Form was sought.

[14]    On 16 May 2013, further immaterial amendments were made to the Claim Form and Points of Claim.

[15]    On 9 August 2013, Comodo sought to make significant amendments to the Amended Claim Form and Amended Points of Claim. The essence of the amendments was to introduce a monetary claim for $4,563,464 based on the Defendants' alleged breaches of fiduciary duty and breaches of trust. Comodo was alleging that the Defendants retained the said sum of $4,563,464 out of a total of $10,153,464.50 paid by third party investors for shares in Comodo. It was also alleged that the Defendants had acted in breach of the joint venture agreement and had failed to account for the secret profits they had made to the detriment of Comodo.

[16]    On 17 October 2013, Bannister J struck out the proposed amendments to the Amended Claim Form and Amended Points of Claim leaving just the simple claims for declarations that the Defendants are not members of Comodo based on the fact that they had not paid for the shares and were not on the register. The Order however expressly stated that the strike out was without prejudice to Comodo's right to apply for permission to amend.

[17]  The Defendants' Points of Defence and Counterclaim and Comodo's Reply and Defence to Counterclaim had been served in September and October 2013 respectively. The latter pleading was a straight denial of the Counterclaim without any allegations of misrepresentation or breach of duty.

[18]  On 3 November 2014, Renaissance issued an application for summary judgment.

[19]  On 25 November 2014, by way of response to the summary judgment application and pursuant to the express rights to do so in Bannister J's Order of 17 October 2013, Comodo made a further application to amend its pleadings in the form of a Re-Amended Claim Form and Re-Amended Points of Claim. The amendments were the same as were struck out by Bannister J on 17 October 2013. Comodo also sought permission to amend its Reply and Defence to Counterclaim. The grounds of the application as set out in the notice included the following:

> "As the facts and additional claims herein arise from allegations of fraudulent breach of trust, misrepresentation and or breach of fiduciary duties, the nature of which only came to the knowledge of the Claimant from on or about 14 September 2012 together with claims to recover from a trust property to which no limitation period attaches by virtue of the provisions of s.19(1)(b) Limitation Act."

[20]  On 4 December 2014, Bannister J dismissed the application to amend the Re-Amended Claim Form and Amended Points of Claim. This was largely on the basis that they were arguably time-barred and did not arise out of the same facts upon which the original claim was based. In relation to the amendments to the Reply and Defence to Counterclaim, Bannister J allowed some of them but not all. In particular, the misrepresentation amendments were not allowed. Permission to appeal was granted.

[21]  On 15 December 2014, Bannister J granted summary judgment to Renaissance on its Counterclaim. Mr Katz had not issued a summary judgment application.

[22]  On 18 December 2014, Comodo lodged an appeal against the summary judgment and in respect of the disallowed amendments to the Reply and Defence to Counterclaim. Importantly it took a decision not to appeal in respect of the disallowed amendments to the Re-Amended Claim Form and Amended Points of Claim. Mr Francis said that this was because Comodo was not interested in pursuing a monetary claim.

6

[23]   After a hearing on 21 May 2015, the Court of Appeal delivered its judgment on 3 May 2016. The Court of Appeal allowed Comodo's appeal on both summary judgment and the amendments to the Reply and Defence to Counterclaim. In paragraph 96 of the judgment of Blenman JA this was said:

> "96.    In the case before the court, the judge was not merely required to rectify the register but critically would have needed to determine who had title to the shares. He would only be able properly to do so after there is a full ventilation of the issues that have been joined by Comodo and Renaissance."

In allowing the amendments to the Reply and Defence to Counterclaim, Blenman JA said that the misrepresentation allegations together with Mr Emanuel's dealings with third parties were "*fundamental to Comodo's claim*" (para. 76).

[24]   Until this application, the pleadings have remained the same from the time of the Court of Appeal judgment. The Re-Amended Claim Form and Re-Amended Points of Claim are as struck through by Bannister J. The Amended Reply and Defence to Counterclaim is as per the amendments allowed by both Bannister J and the Court of Appeal. These were the pleadings that Comodo was prepared to go into the trial with in March 2018. No application to amend was made before that trial date.

[25]   Comodo and the Defendants blame each other for delays and tactical game playing. It is not relevant for this application as to who is to blame. So I will set out a neutral chronology of the key procedural events from the Court of Appeal judgment to date:

(1)   On 8 June 2016, the Defendants filed a Rejoinder and Reply to Amended Defence to Counterclaim.

(2)   On 21 March 2017, Wallbank J gave directions as to disclosure, witness statements and a pre- trial review. There was a direction for the trial to be listed in March 2018 unless an earlier suitable date became available.

(3)   In May 2017, standard disclosure took place.

(4)   On 6 December 2017, witness statements were exchanged.

(5)   On 15 January 2018, supplemental witness statements were exchanged.

(6)   On 23 January 2018, there was a pre-trial review at which the Defendants' application for a freezing injunction was heard and granted.

(7) On 21 February 2018, Adderley J heard both parties' applications for specific disclosure. Certain categories were ordered and others refused on both applications.

(8) On 28 February 2018, the Defendants applied to Adderley J for permission to appeal the disclosure order but this was refused.

(9) On 2 March 2018, the Defendants applied *ex parte* to the Court of Appeal for permission to appeal and were granted it.

(10) On 9 March 2018, the Defendants' application for an adjournment of the trial due to commence on 13 March 2018 was heard. It was opposed by Comodo. The adjournment was granted.

(11) On 10 May 2018, the Defendants applied for a new trial listing.

(12) On 11 June 2018, Comodo applied for the discharge of a freezing injunction granted on 23 January 2018 to continue to trial. Judgment is still awaited on that application.

(13) On or around 9 July 2018, the parties were notified that the trial was relisted on 25 June 2019 with a time estimate of 12 days.

(14) On 11 July 2018 the Court of Appeal heard the Defendants' disclosure appeal and on 13 July 2018 allowed the appeal and ordered Comodo to provide disclosure within 14 days. However, on 27 July 2018 the Court of Appeal granted a stay pending determination of Comodo's application for conditional leave to appeal to the Privy Council, although it was ordered to provide the disclosure in a sealed envelope to be lodged in the Court Registry.

(15) On 8 October 2018 the Court of Appeal refused Comodo conditional leave to appeal. A further partial stay was ordered pending an application by Comodo to the Privy Council for a stay and special leave to appeal.

(16) On 23 October 2018, Comodo indicated that it would not be seeking leave to appeal to the Privy Council. In the same letter Comodo said that it was likely that they would "*wish to tidy up the pleadings*" (see below).

(17) On 5 November 2018 the parties signed a consent order to release the sealed disclosure from the Court.

**The Application to amend**

[26]  The letter dated 23 October 2018 from Comodo's legal practitioners, Maples and Calder ("**Maples**")[3] was the first time there had been any suggestion that Comodo was considering amending its pleadings. After notifying the Defendants' legal practitioners, Conyers Dill & Pearman ("Conyers"), that Comodo was not pursuing an appeal to the Privy Council on disclosure, Maples said in that letter (emphasis added):

> "To that end, we are currently reviewing the pleadings and evidence, and continuing to examine the adequacy of your clients' disclosure, to ensure that everything is in place well in advance of the trial date to allow the trial to proceed smoothly...
>
> From the limited work we have already done, it appears likely <u>we will wish to tidy up the pleadings to bring them in line with the facts disclosed by the witness statements.</u> We will be in touch shortly to confirm whether this is so, in which case we will also provide you with our proposed draft amendments for your consideration."

[27]  On 29 October 2018, Maples wrote again to Conyers, this time enclosing the proposed amendments contained in a draft Re-re-amended Points of Claim and Re-Amended Reply and Defence to Counterclaim. In that letter Maples said this (emphasis added):

> "As you will recall, our letter indicated our intention to tidy up our client's pleadings to bring them in line with the facts disclosed by the witness statements in these proceeding.
>
> Please now find enclosed drafts of our client's proposed Re-re-amended Points of Claim and Re-amended Reply and Defence to Counterclaim.[4]
>
> <u>The amendments are entirely based on the facts already pleaded and in evidence and serve to clarify the relief sought by the Claimant.</u> Our client intends to issue an application in the week commencing 5 November 2018 to ask the Court for permission to file the amended statements of case. We do not foresee any impact on the trial date as a result of the amendments being granted.
>
> We hereby request that your clients to confirm that they do not oppose our client's application to the Court for permission to amend the two statements of case.
>
> We look forward to receiving such confirmation by close of business on Monday, 5 November 2018."

---

[3] Maples had taken over from Walkers in or around April 2018

[4] A proposed Further Re-Amended Claim Form was subsequently included in Comodo's application.

[28] Mr Francis submitted that the Defendants should just have consented to the amendments as they did not change anything and did not threaten the trial date. I think it was unrealistic to expect the Defendants simply to accept the amendments and it was always very likely that they would mount vigorous opposition to such an application, as they have done. Whether that is justified, I will have to decide, but I do feel that it was incumbent on Comodo to get on with its application, knowing the likely reaction and to avoid any threat to the new trial date which was both parties' professed aim.

[29] No consent was forthcoming and Comodo issued its application on 20 November 2018. It was not accompanied by a Certificate of Urgency and so it had to take its turn in the list, coming on before me four months later.

[30] The Grounds set out in the Notice of Application included the following (emphasis added):

> "(2)   The Applicant has made this application <u>promptly</u> after becoming aware it wished to make the amendments. The decision to do so was made in the course of a review of the proceedings conducted after a Court of Appeal hearing on 8 October 2018.
>
> (3 )   The Applicant would be seriously prejudiced if the application were refused:
>
> (a) The amendments are <u>necessary</u> to clarify and ensure that all matters in dispute, as apparent from the pleadings and evidence, are determined at trial and that appropriate relief may be granted;
> (b) The amendments rely on <u>facts already referred to in the pleadings and evidence,</u> most, if not all, of which are common ground between the parties.
> (c) They seek to bring clarity to the Applicant's case by particularising existing allegations of breach of fiduciary duty and elaborating upon the precise legal consequences thereof.
> (d) They set out an available alternative legal analysis for the relief currently claimed, namely declarations of the Applicant's ownership of the disputed shares.
> (e) They simplify the claim and may shorten the trial.
>
> In the premises, the existing pleadings and evidence demonstrate the Applicant is legally entitled to the relief currently claimed on a slightly modified legal basis to that currently pleaded. The amendments serve to explain this and to ensure the Applicant is entitled to rely at trial on all legal arguments to which the facts give rise, so that the case is disposed of justly."

[31] The first point to make is that, despite the alleged "*necessity*" of the amendments in the application notice, Mr Francis made it quite clear that the amendments are unnecessary and

are merely a "*tidying up exercise*". Perhaps more importantly is that it appears from the application notice that the whole purpose is to allow Comodo to claim alternative relief, that the Disputed Shares are held on trust for Comodo, and that this is based on the "*facts already referred to in the pleadings and evidence*" most of which are apparently common ground.

**The evidence that supports the alternative claim**

[32]     Mr Francis fully accepted that all the evidence that Comodo relies upon as supporting the amendments pre-dates the original trial date and would have been fully deployed at the trial in support of Comodo's unamended case. He has particularly relied upon what has been called the Colorado evidence, which Mr Francis described as a "*watershed*" as it confirmed absolutely what had always been Comodo's case, that Renaissance was merely being used by Mr Emanuel as a "*pass through vehicle*" to enable funds to be provided by third party investors to Comodo.

[33]     The Colorado evidence is dealt with in Mr Abdulhayoglu's Second Witness Statement dated 15 January 2018, prepared for the purposes of the trial, but it occupies just 4 paragraphs out of a total of 221. It now appears to be at the forefront of Comodo's case and, as Mr Abdulhayoglu said in para. 48 of his Eleventh Affidavit sworn on 20 November 2018 in support of this application, "*is of central importance to the proposed amendments and the outcome of the action*".

[34]     The Colorado evidence first surfaced in the course of Comodo's search for evidence in rebuttal to Mr Katz's first witness statement dated 6 December 2017 and it is a transcript of sworn testimony given by Mr Emanuel to the United States Bankruptcy Court for the District of Colorado in 2004. The claim before the court was by Stinky Love Inc against a Mr Lacy and Renaissance. Mr Lacy was a bankrupt who had purportedly invested $800,000 into Renaissance and Stinky Love Inc obtained freezing relief over Renaissance's bank account. In resisting Stinky Love Inc's claims to those funds, Mr Emanuel gave evidence on behalf of Renaissance to explain what was Renaissance's function and whether it was Renaissance's money in the account. Mr Emanuel said that "*Renaissance is a funding entity for the sole purpose of funding Comodo*". When he was asked why Renaissance did not produce financial statements, Mr Emanuel said:

"Because Renaissance doesn't really have a profit and loss statement. All it does is pass monies on to Comodo, and Comodo has accountants…And the only thing that Comodo wants from Renaissance is funding. And therefore Renaissance does not carry a balance sheet. The money is passed directly from Renaissance to Comodo, and its subsidiaries. And that's the reason why it has…and everybody is under the understanding that that's what occurs."

[35]     It is obvious that this is highly material evidence for Comodo. As Mr Abdulhayoglu said in para. 48 of his Eleventh Affidavit:

"It provides direct, incontrovertible, contemporaneous evidence from Mr Emanuel, the principal of Renaissance, under oath confirming that Renaissance's sole intended purpose was to raise and pass on funds to Comodo as its agent and trustee; that Renaissance itself was not intended to, nor (according to his evidence) did it, turn a profit or hold assets beneficially. It makes clear that Renaissance took money from investors which was intended to pass "*directly from Renaissance to Comodo*"."

[36]     Of course this crucial evidence was available for the trial last year and Comodo was content to go into that trial without its pleadings being amended. Furthermore, Comodo had other evidence on the nature of Renaissance's role, some of which had been specifically pleaded (Dr Nisi and Mr and Mrs Golden) and others of which had emerged from the evidence in relation to what third party investors were told as to Renaissance's role, including Ms Blank, Mr Stierwalt[5], Mr Gatti, Mr Bruni and Ms Kimmel. It also had evidence of a share exchange scheme whereby Renaissance shares would be exchanged for Comodo shares, Mr Emanuel's estate tax returns showing Renaissance as a "*non-active nominee company*" and the lack of Renaissance financial statements for the same reason as was referred to in Mr Emanuel's evidence in Colorado. As the Defendants point out all this evidence has been available to Comodo for a considerable period of time, pre-dating the witness statements in some cases. Nevertheless it is what has inspired this application.

**The current pleadings**

[37]     As stated above, the Re-Amended Points of Claim is currently 2 paragraphs long. Paragraph 2 asserts simply that neither of the Defendants are members of Comodo because:

---

[5] Mr Emanuel specifically stated in a letter to Mr Stierwalt that Renaissance "*acts as a pass through entity for the funding [of] Comodo*"

"(a)    In breach of Article 4.2 of [Comodo's] Articles of Association, neither Defendant has paid for any shares or share certificates issued in their name or to their benefit; and

(b)    Their names do not appear on the Share Register."

On the basis of those averments, Comodo claims declarations that the Defendants "*are not [members] of [Comodo]*".

[38]    Mr Francis says that, because of the way the pleadings evolved, the meat of Comodo's case is pleaded in the Amended Reply and Defence to Counterclaim. Furthermore, he says that Comodo has alleged breach of fiduciary duty, breach of trust and that the Disputed Shares are held on trust for Comodo. He took me to the following paragraphs:

(a) Para. 3 of the Reply – this is the response to the Defendants' plea that the share certificates were duly signed and sealed on behalf of Comodo. Comodo's response was:

"the averred signatures and corporate seal were wrongfully obtained by the Defendants pursuant to the representations of and/or <u>breach of fiduciary duty</u> by [Mr Emanuel] at all material times after the Initial Representations a director of [Renaissance] as particularised below in the Amended Defence to Counterclaim."

This was a rather vague plea of breach of fiduciary duties owed to Renaissance and says that this is particularized later in the pleadings.

(b) Para. 5 of the Reply contains a bare assertion of "*Mr Emanuel's false representations and/or breach of fiduciary duty particularised below in the Amended Defence to Counterclaim.*"

(c) Para 16 of the Defence to Counterclaim – Comodo avers that the only money received by Renaissance between January 1999 and January 2000 was "*from investors seeking to invest directly in [Comodo].*"

(d) Then in para. 18, there is an allegation of what Mr Francis described as a **Quistclose** trust[6] that monies paid by Mr and Mrs Golden to Renaissance "*were expressly to be used for the purchase of shares in [Comodo] and were accordingly impressed with a trust for them to be used for that purpose and none other*". I assume that, as is pleaded in para. 19, Mr and Mrs Golden did receive shares in Comodo such that the **Quistclose** trust did not survive.

---

[6] After **Barclays Bank Ltd v Quistclose Investments Ltd** [1970] AC 567 – in which it was held that a loan for a specific purpose, where the money is not used for that purpose, it is held by the borrower on resulting trust for the lender.

(e) Para. 50 contains a form of trust for Comodo plea. It states (emphasis added):

> "The Loan Representation was false in that the money paid by Renaissance to [Comodo] was not a loan by Renaissance but the payment to [Comodo] of money it had collected as <u>agent</u> for [Comodo] from persons who had subscribed for shares in [Comodo], and which it held on trust for [Comodo]."

While it is true to say that there is a plea of a trust for Comodo in there, and Mr Francis described it initially as an express trust but later as a constructive trust, there are two important points to be made:

    (i)    Para. 50 is an explanation as to why the Loan Representation was false; that was because Renaissance had not loaned any money to Comodo but rather the third party investors had loaned money to Comodo via Renaissance who was acting as Comodo's agent;

    (ii)    What is pleaded is only a trust of the monies and this has been done purely to show that Renaissance did not provide its own monies to Comodo; there is no claim by Comodo for those monies because it accepts that the monies were indeed paid to it. This is clear from para. 51 which states that "*no consideration was provided for the Loan Shares*".

Accordingly, this has nothing to do with a trust of the Disputed Shares. Nor is there any plea of breach of trust. And the existing plea is clearly supported by the Colorado evidence.

(f) Paras 71 and 72 contain allegations that the making of the false representations to induce the issue of the share certificates to him were in "*breach of the fiduciary duty [Mr Emanuel] owed to [Comodo] as one of its directors.*" This is the only plea of breach of fiduciary duty in the Defence to Counterclaim and the strange thing is that in the Reply there is an alleged breach of duty to Renaissance whereas in the Defence to Counterclaim there is an alleged breach of duty to Comodo. Furthermore, the latter was meant to be the particularisation of the former see subparagraphs (a) and (b) above. In any event, the plea is limited to asking that the Court should not exercise its discretion in favour of the Defendants because, *inter alia,* Mr Emanuel acted in breach of fiduciary duty. There is no wider plea of constructive trust, dishonest assistance or tracing. The pleading is totally silent on those issues.

[39]    Mr Francis says that there are already allegations of breach of fiduciary duty and the existence of trusts and so the proposed amendments are merely "*tweaking*" those existing allegations. As I have stated above, I consider that the existing pleas in that respect are very narrowly confined to answering a specific averment in the Counterclaim. There is no real allegation of trust, certainly no claim to a continuing trust, and the breach of fiduciary duty is wholly based on the alleged false representations and only relied upon for the purposes of the exercise of the Court's discretion, if the Defendants were otherwise entitled to rectification.

[40]    Mr Francis also said that everyone has always understood the case to be about a fraudulent scheme and the dishonesty of Mr Emanuel and he showed me the transcript of the *ex parte* hearing before the Court of Appeal on 2 March 2018 where the Defendants' counsel said that on a number of occasions. While that may be so, I have to look at the case in the way it is pleaded, particularly when considering an application to amend, and if fraud or dishonesty was part of the claim, it would need to have been clearly pleaded with all proper particulars. There is a plea that the representations were fraudulently made but there is no other plea of a wider fraud or fraudulent scheme.

**The Proposed Amendments**

[41]    Comodo's principal amendment is to claim an alternative relief. The existing relief sought is a declaration that the Defendants are not members of Comodo. The new alternative relief is:

> "Alternatively, a declaration that the shares held by the [Defendants] have at all material times been held, and continue to be held, on trust for [Comodo]."

On the face of it, that is a quite different alternative, particularly where there appears to be no allegation in any of the existing pleadings that the Disputed Shares are held on trust.

[42]    Comodo seeks to add new paragraphs 3 and 4 to the Re-Amended Points of Claim. Mr Chaisty QC says that these paragraphs are too vague, meaningless and seriously lacking in particularity.

[43]    Paragraph 3 attempts to establish that both Defendants owed Comodo fiduciary duties which they breached. It starts in this way:

"3.     Further or alternatively, if which is denied, the First Defendant or Second Defendant is a member of [Comodo], it is averred the shares held by it [sic] were acquired in breach of fiduciary duties owed to [Comodo], which arose and were breached in the manner particularised below"

There then follows eight subparagraphs of Particulars of Breach of Fiduciary Duty which I will not set out in full. The first seven subparagraphs set out the basis upon which the Defendants are said to have owed fiduciary duties to Comodo, including reliance on the joint venture agreement, the Colorado evidence (Renaissance's "*sole purpose and function…was to act as a pass through corporate vehicle*") and the fact that Renaissance was in a position of trust and confidence. Then subparagraph (8) reads as follows:

"In breach of each and all of the aforesaid duties, and in dishonest assistance of each other's breaches of duty, without the informed consent of [Comodo], Emanuel and the First Defendant failed to procure direct investment into [Comodo] of a substantial proportion of funds identified as available for the purpose and instead caused the same to be diverted to themselves and used, inter alia, to finance the acquisition of the shares now purportedly held by the Defendants."

[44]    There are a series of problems with the rolled up pleas in this subparagraph:

(a) It introduces for the first time into this case a plea of dishonest assistance; Mr Francis says that there is no other way to describe the conduct of the Defendants; that may be so but it is still the first time that it has been alleged and there are no particulars of dishonesty pleaded (contrary to the very strict requirements to do so – see Lord Millett's judgment in **Three Rivers District Council v The Governor and Company of the Bank of England**[7]);

(b) Mr Francis said that the allegation was made to cover any argument that might be made about the capacity that Mr Emanuel was acting under; so that he was either personally in breach of duty and assisted by himself as a director of Renaissance or as a director he had caused Renaissance to act in breach of fiduciary duty and he had personally dishonestly assisted that; while this novel plea might be thought to cover all bases, it seems to me that the dishonest assistance allegation does not actually lead anywhere in terms of the relief sought – it cannot give rise in itself to a trust;

---

[7] [2003] 2 AC 1, at paras. 183 to 190.

(c) It refers to "*a substantial proportion of funds*" but that is a very imprecise plea and at this late stage of the proceedings, the Defendants are entitled to know exactly what is being alleged;

(d) It also refers to the "*funds identified as available for the purpose*" but it is wholly unclear which funds are said to have been identified and how and by whom that was done;

(e) It says that the funds were "*used, inter alia, to finance...*" which implies that some of the funds were not so used; again there needs to be clarity in the pleadings and it is too late now to put the burden on the Defendants to make requests for further information.

[45]   Paragraph 4 then says as follows:

> "On the aforesaid further or alternative premise, the said shares have accordingly been held at all material times, and continue to be held by the First Defendant and Emanuel/the Second Defendant on a constructive trust for the benefit of [Comodo]; and the First Defendant and the Second Defendant are bound to deal with the same in accordance with the Claimant's directions."

[46]   This is a completely new allegation that the Disputed Shares are held on constructive trust. Mr Chaisty QC drew my attention to what is said in paragraph 71 of Comodo's skeleton argument as follows:

> "The monies taken from investors were misappropriated in breach of fiduciary duty and held by the Defendants at all material times on constructive trust for Comodo, which is entitled to trace into the Disputed Shares these monies were used to purchase."

That purports to be a summary of the proposed amendments to the Re-Amended Points of Claim yet for the first time there is mention of tracing as part of Comodo's claim. Mr Chaisty QC says that that potentially opens up a number of issues including whether the Defendants might want to plead defences to tracing such as change of position (if that is a defence[8]). Probably more importantly, it highlights that there is a disconnect in the proposed amended pleading between the third party investment monies and the Disputed Shares. The Re-Amended Reply and Defence to Counterclaim had pleaded a **Quistclose** trust of the monies in favour of the third party investors, not Comodo and a trust of the monies for the Loan shares for Comodo. In

---

[8] **Snell's Equity** 33rd Ed suggests that the authorities are divided on this.

short, the pleadings are confusing in relation to the trust claims and the position has not been made clearer by the proposed amendments.

[47]    The proposed amendments to the Re-Amended Reply and Defence to Counterclaim really follow from the proposed amendments to the Re Amended Points of Claim. There is no need for me to deal with them in any detail. It seems to me that they stand or fall with the primary amendments to the Re-Amended Points of Claim.

**Legal Issues**

(a) <u>Limitation</u>

[48]    Comodo is seeking to introduce a new claim, the declarations that the Disputed Shares are held on trust for Comodo. (I have not had any submissions as to whether it is possible, as a matter of law, for shares issued by Comodo to be immediately impressed with a trust for Comodo. It seems to me that this is a curious proposition.) The new claim is based on alleged breaches of fiduciary duty that took place many years ago between 1999 and 2003. Accordingly, CPR 20.2 is potentially engaged. It provides:

> "20.2   (1)    This rule applies to a change in a statement of case after the end of a relevant limitation period.
>
> (2)    The court may allow an amendment the effect of which will be to add or substitute a new claim but only if the new claim arises out of the same or substantially the same facts as a claim in respect of which the party wishing to change the statement of case has already claimed a remedy in the proceedings."[9]

[49]    It should not be forgotten that the reason this is important is because, if the amendment is allowed, it will be treated as though the new claim was made at the time the Claim Form was issued. In other words, the Defendants will be deprived of a limitation defence and Comodo is effectively asking the Court to make a summary determination that a limitation defence is not available to the Defendants. There is no dispute between the parties that the burden of proof is

---

[9] There is no equivalent of s.35 of the English Limitation Act 1980 in the BVI Limitation Ordinance (although the English procedural rule in CPR 17.4 is in identical terms to CPR 20.2), a point that may be relevant to the new facts and dealt with below.

on Comodo. Furthermore, the Court retains a discretion, even if the particular matters in CPR 20.2 are satisfied.

[50] The first question therefore is whether the new claim is being introduced "*after the end of a relevant limitation period*". It is for Comodo to prove that the Defendants' limitation defence/argument is not reasonably arguable – see **Chandra v Brooke North**[10] and **Ballinger v Mercer Ltd**[11]. That is a high bar for Comodo but Mr Francis fairly accepted that this is the appropriate test. If he does not prove that it is not reasonably arguable, then Comodo has to prove the other matters in CPR 20.2.

[51] The limitation issues concern s.19 of the Limitation Ordinance 1961 (Cap 43), the equivalent of s.21 of the English Limitation Act 1980. The material provisions of s.19 are as follows:

> "19. (1) No period of limitation prescribed by this Ordinance shall apply to an action by a beneficiary under a trust, being an action –
> (a) In respect of any fraud or fraudulent breach of trust to which the trustee was a party or privy; or
> (b) To recover from the trustee trust property or the proceeds thereof in the possession of the trustee, or previously received by the trustee and converted to his use.
>
> (2) Subject as aforesaid, an action by a beneficiary to recover trust property or in respect of any breach of trust, not being an action for which a period of limitation is prescribed by any other provision of this Ordinance, shall not be brought after the expiration of six years from the date on which the right of action accrued…"

[52] The issue is whether this is a claim by Comodo within s.19(1)(b) "*to recover from the trustee trust property or the proceeds thereof*" as Mr Francis argues or whether it is within s.19(2) as Mr Chaisty QC argues on the basis that it is not within s.19(1)(b). I should perhaps refine that issue to say that Comodo has to prove that it is not reasonably arguable that the new claim is within s.19(2) rather than s.19(1)(b). (Mr Francis did also rely, in his oral submissions, on s.19(1)(a) but as Comodo has not pleaded fraud in this respect – save the vague plea of dishonest assistance – that does not seem to me to be reasonably arguable.)

[53] The critical question is whether the constructive trust pleaded in the proposed new paragraph 4 of the Re-Amended Points of Claim is a so-called class 1 institutional constructive trust or a

---

[10] [2003] EWCA Civ 1559.
[11] [2014] EWCA Civ 996.

19

class 2 remedial constructive trust – both of which were devised and explained by Millett LJ (as he then was) in **Paragon Finance plc v DB Thakerar & Co**[12] (see also the explanation of the distinction in **Williams v Central Bank of Nigeria**[13]). This in turn depends on an analysis of where the line is to be drawn between two cases: **JJ Harrison (Properties) Ltd v Harrison**[14] ("**Harrison**"), relied on by Mr Francis; and **Gwembe Valley Development Co Ltd v Koshy (No. 3)**[15] ("**Gwembe Valley**"), relied on by Mr Chaisty QC.

[54]   **Snell's Equity**, 33rd Ed in para. 7-063 refers to both **Harrison** and **Gwembe Valley** in the passage set out below:

> "Nor does the six-year limitation period apply where the claim is in reality a claim to recover trust property. This includes situations where the fiduciary was not expressly appointed as a trustee but assumed the duties of a trustee by a lawful transaction and that transaction is not impugned, but does not include situations where the "constructive trust" which the principal claims is no more than a formula for equitable relief. In other words, the "trust" on which the claimant relies must pre-exist the conduct which constitutes the cause of action. Thus a director of a company who obtains property from the company in breach of fiduciary duty holds that property on constructive trust and cannot assert a limitation period against a claim for the return of the property as "his obligations as a trustee in relation to that property predate the transaction by which it was conveyed to him".[16] But claims against a director of a company for an account of profits, and a constructive trust over those profits would have been time-barred after six years where the claims did not depend on the director having had any pre-existing responsibility for the company's property, but rather on his interest in the transaction which led to the profits; the fact that the profit was made in the context of a pre-existing fiduciary relationship was insufficient to avoid the six-year limitation period (although the claims were, in the result, not statute barred because the director had acted fraudulently).[17]"

[55]   In **Harrison**, a director of a company had failed properly to disclose the development potential of a property owned by the company which he then acquired personally from the company. This had happened 11 years before proceedings were commenced. The director was held liable to account for the profits he made on the transaction on the basis that when the property was transferred to him in breach of his fiduciary duties to the company he held the property on constructive trust for the company. Chadwick LJ in the Court of Appeal (the other two members

---

[12] [1999] 1 All ER 400.
[13] [2014] AC 1189.
[14] [2001] EWCA Civ 1467.
[15] [2003] EWCA Civ 1048.
[16] This was a quote from **Harrison.**
[17] This is referring to **Gwembe Valley.**

of the Court agreed) set out four propositions which he said were "*beyond argument*" (para. 25):

> "(i) that a company incorporated under the Companies Acts is not trustee of its own property; it is both legal and beneficial owner of that property; (ii) that the property of a company so incorporated cannot lawfully be disposed of other than in accordance with the provisions of its memorandum and articles of association; (iii) that the powers to dispose of the company's property, conferred upon the directors by the articles of association, must be exercised by the directors for the purposes, and in the interests, of the company; and (iv) that, in that sense, the directors owe fiduciary duties to the company in relation to those powers and a breach of those duties is treated as a breach of trust."

Chadwick LJ then went on to explain that if a director was the recipient of the property disposed of in breach of his fiduciary duties, it would be held on a Class 1 type constructive trust and so within s.21(1)(b) of the Limitation Act 1980 (i.e. s.19(1)(b) of the Limitation Ordinance). The learned Judge said as follows:

> "26.　It follows from the principle that directors who dispose of the company's property in breach of their fiduciary duties are treated as having committed a breach of trust that a person who receives the property with knowledge of breach of duty is treated as holding it upon trust for the company. He is said to be a constructive trustee of the property…
>
> 27.　It follows, also, from the principle that directors who dispose of the company's property in breach of their fiduciary duties are treated as having committed a breach of trust that, a director who is, himself, the recipient of the property holds it upon a trust for the company. He, also, is described as a constructive trustee. But as Millett LJ explained in *Paragon Finance plc v Thakerar & Co* [1999] 1 All ER 400, at pp.408g-409g, his trusteeship is different in character from that of the stranger. He falls into the category of persons who, in the words of Millett LJ [at p.408j] …"though not strictly trustees, were in an analogous position and who abused the trust and confidence reposed in them to obtain their principal's property for themselves."….
>
> 29.　There is no doubt that Millett LJ regarded it as beyond dispute that a director who obtained the company's property for himself by misuse of the powers with which he had been entrusted as a director was a constructive trustee within the first category…"

[56]　In my view the critical factors that put the director into the class 1 institutional constructive trustee category were that he was a director of the company with trustee-like duties in respect of the company's property and that the particular property in question was owned by the company <u>before</u> the transaction that gave rise to the constructive trust. Thus the director had pre-existing trustee-like duties in respect of that property which effectively continued after it was

acquired by him in breach of those duties. I will come on to consider if this is the situation in respect of the Defendants that is proposed to be pleaded. At this stage, however, it is right to point out that Renaissance was never a director of Comodo, so it could not have had the trustee-like duties in respect of Comodo's property or assets that are discussed in **Harrison**.

[57]   Turning now to **Gwembe Valley**, the defendant was the managing director of the claimant company, GVDC and a shareholder in it. He also owned and controlled another company, Lasco, which he caused to lend money to GVDC. As a result of the loans GVDC acknowledged a debt to Lasco of US$5.8m but this sum had been paid in Zambian currency that had only cost Lasco US$1m. The defendant did not disclose this to the board of GVDC nor of his interest in Lasco. It was held that the defendant's liability to account for his secret profits would have been time-barred because this was not a class 1 type constructive trust. In the event, however, the claim was not time-barred because of the fraud exception in s.21(1)(a). After a thorough analysis of all the case law including **Harrison**, Mummery LJ said this at para 119 (emphasis added):

> "If that is the correct analysis, then it is clear in our view that any trust imposed on Mr Koshy is a class 2 trust, within Millett LJ's classification. We agree with the judge that liability to account for unauthorized profits may arise within a wide spectrum of factual situations. However, that does not alter the analysis under s 21(1)(a) and (b), each of which must be applied in accordance with its own terms. We disagree, respectfully, with the judge in treating dishonesty as a factor taking the case from class 2 to class 1, for the purposes of para (b). Nor do we think that is the effect of the passage from Chadwick LJ's judgment in *Harrison's* case quoted by the judge ([2005] 1 BCLC 478 at [295]). As the judge recognized, in that case the director transferred to himself property which had previously belonged to the company, and in relation to which he had 'trustee-like responsibilities' before the transaction in question. By contrast, Mr Koshy's liability to account for undisclosed profits, and any constructive trust imposed on those profits, do not depend on any pre-existing responsibility for any property of the company. They arose directly out of the transaction which gave rise to those profits, and the circumstances in which it was made. The fact that Mr Koshy was in a pre-existing fiduciary relationship with the company was not enough, by itself, to bring the case within class 1, any more than it was in *Taylor v Davis*."

[58]    In **Halton International Inc v Guernroy Ltd**[18], the Court of Appeal had the occasion to consider this question again. Carnwath LJ pointed out the difference between **Harrison** and **Gwembe Valley** by saying (para. 16):

> "The difference between the two cases, in short, was that while in the former the director had a pre-existing "trustee-like responsibility" in relation to the particular property which was the subject of the action, in the latter he did not."

[59]    It is necessary to return to the proposed amended claim. The constructive trust pleaded in paragraph 4 is said to come about because of the breaches of fiduciary duty set out in paragraph 3. There is no plea in paragraph 3 of any pre-existing property of Comodo in respect of which the Defendants are said to have owed trustee-like responsibilities. Paragraph 3 sets out the fiduciary duties that Comodo says the Defendants owed to it.

[60]    The position is actually quite confusing. The Disputed Shares are the property said to be held on constructive trust for Comodo. I assume it is asserted that they were subject to that constructive trust immediately as they were issued. Before they were issued, they did not exist. I do not see how it can be said that the Defendants had pre-existing duties in respect of property that did not even exist.

[61]    It may be that Comodo relies on the way it was put in paragraph 71 of its skeleton argument, namely that it was the "*monies taken from investors*" that were held on constructive trust for Comodo and those monies can be traced into the Disputed Shares. But this is not what is pleaded. And in any event if the constructive trust is only said to arise upon the misappropriation of the monies "*taken*" from investors, this too is not property that is owned by Comodo until the alleged misappropriation has taken place. The constructive trust only arises through the transaction itself and it cannot be said that there was any sort of trust of the monies or the shares before the transaction. There was no property that could be subject to such a trust.

[62]    I am therefore of the view that it is reasonably arguable that the pleaded claim is within s.19(2) of the Limitation Ordinance. Accordingly, CPR 20.2 is engaged and it is now necessary to consider whether Comodo can establish the other elements of CPR 20.2.

---

[18] [2006] EWCA Civ 801.

[63]    Self-evidently the declarations that the Disputed Shares are held on trust for Comodo are a new claim. It is put forward as an alternative claim in the event that the Defendants are held to have acquired title to the Disputed Shares and, I assume, that the share register is ordered to be rectified. That will only happen if Comodo does not succeed in its existing claim – non-payment for the Disputed Shares and non-registration – and its Defence to Counterclaim based on the misrepresentations and **Quistclose** trust does not succeed either. Yet it is the same facts that are said to form the basis for the new claim.

[64]    There was a dispute between the parties as to whether I can look beyond the Re-Amended Points of Claim to test whether it truly is the same facts that are relied upon. Mr Francis says that because of the way the pleadings developed Comodo's real case is set out in the Re-Amended Reply and Defence to Counterclaim. Mr Chaisty QC says that I can only look to the Re-Amended Points of Claim because otherwise this could be open to abuse with a party issuing a claim just before the end of a limitation period but then waiting months to put the real case in its Reply and Defence to Counterclaim. I do not see that as a particularly likely scenario. I prefer to base my decision on the rules.

[65]    I said earlier that there is no equivalent in the BVI to s.35 of the English Limitation Act. That section prescribed what rules of court may provide in respect of allowing new claims to be made by way of amendment outside of the relevant limitation period. Section 35(4) says that certain conditions must be satisfied in order to allow such claims and s.35(5)(a) deals with new claims (emphasis added):

> "In the case of a claim involving a new cause of action, if the new cause of action arises out of the same facts or substantially the same facts <u>as are already in issue on any claim</u> previously made in the original action."

As noted above the procedural rule in response to this in England (now CPR 17.4(2)) is in the same terms as CPR 20.2(2). This seems slightly to narrow the scope of s.35. I have set out CPR 20.2 above but the crucial words are repeated:

> "...<u>only if</u> the new claim arises out of the same or substantially the same facts <u>as a claim</u> in respect of which the party wishing to change the statement of case <u>has already claimed a remedy in the proceedings."</u>

[66]    While s.35 seems to be broad enough to encompass any facts already in issue in the proceedings, CPR 20.2(2) is more restrictive, confining the condition to the facts supporting a "*claim*" in respect of which a remedy is currently being "*claimed*". Thus the rule does tend to suggest that it must be the facts relating to a current claim that have to be the same or substantially the same as support the proposed new claim. If this had been under s.35, I can see that there would be an argument that facts put in issue in the Reply and Defence to Counterclaim might be looked at to see if they are the same or substantially the same, but I do not think that is permissible under CPR 20.2.

[67]    While that may seem on its face to be a somewhat technical approach to the meaning of CPR 20.2, there are three matters that I consider are important to take into account in this regard:

(1) If the amendment is allowed it is bringing in a new claim over 10 years after the expiry of the limitation period, assuming that the Defendants are right on that (and I have concluded that they may very well be) but depriving the Defendants of that absolute defence;

(2) The original attempt to plead breach of fiduciary duty failed over 4 years ago again on limitation grounds and Comodo decided not to appeal that decision but instead to concentrate on the amendments to the Reply and Defence to Counterclaim. That is why Comodo is now in the situation it is with the bulk of its factual case pleaded in the Reply and Defence to Counterclaim; and

(3) My attention has subsequently been drawn to a very recent decision of the English Court of Appeal on 14 March 2019 in **Samba Financial Group v Mark Byers and Hugh Dickson, as liquidators of Saad Investments Company Ltd**[19]. In the judgment of McCombe LJ there is reference to the impact of s.35 as applied in **Goode v Martin**[20], but this confirms my view that the absence of s.35 in the BVI means that CPR 20.2 has to be construed without reference to it. The other important point to emerge from this judgment is that the analysis of "*the same or substantially the same facts*" should in the normal case be limited to an analysis of the pleadings, and not the evidence (see paras. 28 to 30, 49 to 52 and 56).

[68]    The facts pleaded in the Re-Amended Points of Claim are limited to non-payment and non-registration and the new paragraph 3 is clearly new and not substantially the same as those

---

[19] [2019] EWCA Civ 416.
[20] [2002] 1 WLR 1828.

relied on for the original claim. Accordingly, in my judgment, Comodo has not established the requisite matters in CPR 20.2 and permission cannot be granted for the amendments to be made.

[69]     In any event, even if I am wrong about the interpretation of CPR 20.2, it is my view that the facts pleaded in the Re-Amended Reply and Defence to Counterclaim are not the same or substantially the same as the new claim. The facts currently pleaded are Comodo's answers to the Counterclaim. The pleas of breach of fiduciary duty in the Re-Amended Reply and Defence to Counterclaim are all based on the alleged misrepresentations, which are different to the basis for the plea in proposed new paragraph 3 of the Re-Amended Points of Claim. And the plea as to the existence of a trust for Comodo of the monies received from the investors in respect of the alleged loans (para. 50 of the Re-Amended Reply and Defence to Counterclaim) is of a different nature to the constructive trust that is now being alleged.

[70]     I take the point that the so-called Colorado and other evidence as to the nature of Renaissance's role as a "*pass through*" vehicle is evidence that is relevant both to the pleas in the Re-Amended Reply and Defence to Counterclaim and the new claim in paragraph 3 but that is just evidence that will be before the Court anyway; it is not facts that have been clearly pleaded. Comodo's grounds of this application referred to the amendments being based on "*facts already referred to in the pleadings and the evidence*". That may be so, but inclusion in the evidence rather than the pleadings is insufficient for the purpose of CPR 20.2.

Other Relevant Matters

[71]     In the light of my conclusions above, I can deal shortly with the other matters raised by the parties. Even if I am wrong in my conclusions on CPR 20.2, as a matter of discretion, I would not have granted permission. I do not think that the proposed amendments can sensibly be described as merely "*tidying up*" the pleadings or "*clarifying the relief*" being claimed by Comodo. This is a wholly new claim being made up to 19 years after the relevant events upon which it is based and a year after Comodo was prepared to go into the trial without it. There is no new evidence that has come to light since the trial was meant to have happened last year. The reason for why the amendments are being proposed now when they are said to be

unnecessary and trivial I find unconvincing. As Mr Francis stressed to me in his oral submissions, this is well-resourced, hard-fought litigation in which there is equality of arms and in which every single point will be taken by both sides. I cannot believe that this application is being made for any other reason than these are now seen as important and substantive changes to Comodo's case.

[72]   The core principles in relation to the Court's discretion to allow amendments even at a late stage are well-known. Generally, if amendments can be made without causing injustice to the other side, which means that the other side can be adequately compensated by a costs order, then such amendments should be allowed in order that the applying party should be able to put forward its real case at trial. As Brett MR said in **Clarapede & Co V Commercial Union Association**[21]:

> "however negligent or careless may have been the first omission, and however late the purposed amendment, the amendment should be allowed if it can be made without injustice to the other side. There is no injustice if the other side can be compensated by costs."[22]

This has been endorsed by the Court of Appeal here in **George Allert et al v Joshua Matheson et al**[23].

[73]   The factors that the Court is required to take into account in considering an amendment application are set out in CPR 20.1(3) (the same list appears in para. 4 of Practice Direction 20, No. 5 of 2011):

> "(3)   When considering an application to amend a statement of case pursuant to Rule 20.1(2), the factors to which the court must have regard are –
>
>    (a) How promptly the applicant has applied to the court after becoming aware that the change was one which he wished to make;
>    (b) The prejudice to the applicant if the application were refused;
>    (c) The prejudice to the other parties if the change were permitted;
>    (d) Whether any prejudice to any other party can be compensated by the payment of costs and or interest;
>    (e) Whether the trial date or any likely trial date can still be met if the application is granted;

---

[21] (1883) 32 WR 262.
[22] A statement that Neuberger J (as he then was) referred to as having a "universal and timeless validity" – **Charlesworth v Relay Roads Ltd et al** [2000] 1 WLR 230, 235.
[23] GDAHCVAP 2017/0007.

(f)  The administration of justice."

(a)  <u>Promptness of the Application</u>

[74]  Comodo said in its notice of application that: "*the Applicant has made this application <u>promptly</u> after becoming aware it wished to make the amendments*". I do not think that that is an adequate explanation for when this application was made. This factor raises the question as to why the application is being made when it is, rather than the obvious point that it is being made after Comodo has decided to make it.

[75]  Some of the authorities in England have sought to distinguish between "*late*" and "*very late*" applications but I do not find that a particularly helpful guide. As Briggs LJ (as he then was) said in **Hague Plant Limited v Hague and ors**[24]:

> "33.  I consider that the judge was entitled to approach the relevance of lateness in this way. Lateness is not an absolute but a relative concept. As Mr Randall put it, a tightly focussed, properly explained and fully particularised short amendment in August may not be too late, whereas a lengthy, ill-defined, unfocussed and unexplained amendment preferred in the previous March may be too late. It all depends upon a careful review of the nature of the proposed amendment, the quality of the explanation for its timing and a fair appreciation of its consequences in terms of work wasted and consequential work to be done...
> 34.  Lateness, used in this way, is a factor of almost infinitely variable weight, when striking the necessary balance in determining whether or not to permit amendments..."

[76]  As was pointed out by Hamblen J (as he then was) in **Brown v Innovatorone Plc and ors**[25], after quoting from **Swain-Mason v Mills & Reeve**[26] (a "*very late*" application at the trial) (emphasis added):

> "As the authorities make clear, it is a question of striking a fair balance. The factors relevant to doing so cannot be exhaustively listed since much will depend on the facts of each case. However they are likely to include:
>
> > (1)  <u>The history as regards the amendment and the explanation as to why it is being made late;</u>

---

[24]  [2014] EWCA Civ 1609.
[25]  [2011] EWHC 3221 (Comm).
[26]  [2011] 1 WLR 2735.

(2) The prejudice which will be caused to the applicant if the amendment is refused;

(3) The prejudice which will be caused to the resisting party if the amendment is allowed;

(4) <u>Whether the text of the amendment is satisfactory in terms of clarity and particularity</u>."

[77]   Mr Francis said that the Defendants have known since at the latest January 2018 that Comodo was relying on the Colorado evidence. The point is actually against Comodo because if the Colorado evidence is the basis for these amendments, it leaves a period of at least 10 months when Comodo could have made its application to amend. It decided it did not need to amend for the trial in March 2018 but it still took until late October 2018 before there was any hint of a possible amendment. Mr Abdulhayoglu has tried to explain this period in his Fourteenth Affidavit and while I can see that there was a fair amount going on in the litigation then in terms of applications and appeals, it does not explain why Comodo changed its mind about the adequacy of its pleadings.

[78]   The lack of clarity and particularity (see point 4 in **Brown v Innovatorone** above) and the cogency of the proposed amendments are factors to be taken into account in assessing the relevance of lateness. As I have concluded above, the new paragraphs 3 and 4 are seriously lacking in particulars and are vague pleadings for this stage of the proceedings. Furthermore it is unclear how a constructive trust for Comodo can arise in the circumstances pleaded. Mr Francis says that anything that is unclear in the pleading can be further clarified in time for the trial but that is not very satisfactory when the amendments themselves are said to be a clarification of the existing case. It has to stop somewhere.

[79]   So I consider that the lack of an adequate explanation for the lateness of the application, together with unclear and unparticularised proposed amendments make the timing of the application an important factor in the exercise of my discretion.

(b) <u>Prejudice to Comodo if application refused</u>

[80]   As Mr Francis accepted that the application was not necessary and that Comodo was content to go into the trial last March on the existing pleadings based on the same evidence, it is a little difficult to see that there is any real prejudice to Comodo in my refusing its application. Comodo

says it wants to "*flush out*" any opposition that may come from the Defendants at trial in relation to the pleadings, and while I suppose that my refusal to allow the amendments may make that even more likely, I do not believe that pleading points would have been eradicated if I had allowed the amendments.

### (c)  Prejudice to the Defendants if the amendments are allowed

[81]    While I agree with Mr Francis that the extent of the prejudice asserted by the Defendants is probably exaggerated, it seems that Comodo has been engaged on an evidence gathering exercise in the US, partly to try to obtain further evidence to support its case as to the role of Renaissance. I do not see why the Defendants should not also be entitled fully to explore the issue of Renaissance's role by seeking evidence from other investors who obtained their shares through the Defendants. The amendments bring this point sharply into focus and so it would be prejudicial at this late stage to be embarking on a further round of evidence. It could threaten the trial date, which both parties say they have no intention of doing, but it is not inconceivable that applications would be mounted on the back of my grant of permission to amend, for disclosure and other evidence.

### (d)  Can the Defendants be adequately compensated in costs

[82]    As Mr Francis has said, the Defendants are very well resourced and have a large team of lawyers in various jurisdictions acting for them. They could cope with doing whatever they have to in responding to the amendments and seeking further evidence. As such they can be adequately compensated in costs. That may be so, but it is only one factor to go in the balance and if there is an actual threat to the trial date, then it becomes, in my view, a factor with little weight – I refer to what was said in the unreported English Court of Appeal decision in **Worldwide Corpn Ltd v GPT Ltd**[27] – it is set out in para. 69 of **Swain-Mason** supra:

> "In the modern era it is more readily recognized that in truth the payment of costs of an adjournment may well not adequately compensate someone who is desirous of being rid of a piece of litigation which has been hanging over his head for some time, and may not adequately compensate him for being totally (and we are afraid there are no better words for it) 'mucked around' at the last moment.

---

[27] unreported 2 December 1998.

I do not say that that is what Comodo is doing in this case but I think the threat to the trial date is more real than it was suggesting.

(e)  Threat to the trial date

[83]  I accept that both parties do not want to lose the trial date for a second time. Comodo says that there is no jeopardy to the trial date. I sincerely hope so. However, neither party was prepared to say that they would not appeal this judgment and I understand why they could not commit to that, certainly before seeing it. I have endeavoured to produce this judgment as quickly as possible following the hearing and other commitments but I cannot rule out the possibility that Comodo will not seek to appeal and that that could jeopardise the trial date. In other words, it is a relevant factor.

(f)  The administration of justice

[84]  I have to bear in mind the overriding objective, the impact on other litigants of lost judicial time and whether generally it is in the interests of justice that the amendments should be allowed. Clearly if the trial date is lost shortly before it is due to begin as a result of these amendments, then it will affect the proper administration of justice.

[85]  To my mind the core problem with this application is that it lacks a clear purpose. Just wishing to "*tweak*" the pleadings or "*clarify*" the relief being sought is a shaky basis for making such an application not long before the trial. As I have said, I consider the amendments to be much more substantial than Comodo suggests they are and it perhaps would have been better if it recognised that, rather than justifying the application by reference to how it anticipated the Defendants would behave in relation to the pleadings at the trial.

[86]  In all the circumstances and taking into account and balancing the factors set out above, I do not consider that the interests of justice would be served by allowing these amendments at this stage of the proceedings, even if I am wrong about the limitation issue.

**Conclusion**

[87]    I dismiss Comodo's application for permission to amend its pleadings.

[88]    I am grateful to counsel for their clear and helpful submissions.

Hon Mr Justice Michael Green QC

Commercial Court Judge [Ag]

By the Court

Registrar